## Ameripride Linen & Apparel Services, Inc. *vs.* Eat Well, Inc., & another.[1]

No. 04-P-1300.

Worcester. June 8, 2005. - November 4, 2005.

Present: Perretta, Dreben, & Gelinas, JJ.

*Consumer Protection Act,* Availability of remedy, Unfair or deceptive act, Damages, Attorney's fees. *Contract,* Performance and breach. *Damages,* Consumer protection case, Quantum meruit, Breach of contract. *Evidence,* Parol evidence, Cumulative evidence.

The jury at a civil trial were warranted in finding that the plaintiff's actions in inserting into a sales order a figure for minimum fees after representing to the defendants that no minimum fees would be charged were unfair or deceptive, and thus a violation of G. L. c. 93A, not just a breach of contract. [67-68]

At a civil trial in which the defendants successfully alleged in counterclaim that the plaintiff violated G. L. c. 93A, § 11, the judge properly doubled the damages award before considering the amount owing to the plaintiff. [68-71]

The judge at a civil trial did not err in ruling that a particular contract term was not definite enough to preclude parol evidence [71], and even assuming that the judge's exclusion of certain contract documents was erroneous, no prejudice arose, where the terms of the excluded documents were identical to those in the documents admitted in evidence [71-72].

Civil action commenced in the Superior Court Department on August 25, 1999.

The case was tried before *Thomas P. Billings,* J.

*Barry A. Bachrach* for the plaintiff.

*James M. Hughes* for the defendants.

Dreben, J. After a trial in the Superior Court on the plaintiff's claims and the defendants' counterclaims, a jury found for the plaintiff in quantum meruit and for the defendants for breach of contract and violation of G. L. c. 93A, § 11. The jury also

[1]Eating Up the Coast, Inc.

found the plaintiff's actions wilful or knowing and, pursuant to a special question asking what multiplier is appropriate, answered "2." Accordingly, the defendants' c. 93A damages were doubled.[2] Attorney's fees were awarded to the defendants. The plaintiff appeals on numerous grounds, including that there was no violation of c. 93A, but even if the defendants have proved such a violation, they have not shown that they suffered "a loss of money or property" as required by the statute.[3] See *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 44-45 (1975). The plaintiff points to the defendants' concession that even after deducting the amounts overpaid by the defendants and overcharged by the plaintiff, the defendants owe the plaintiff money. We affirm.

1. *Facts.* The jury were warranted in finding the following facts. The plaintiff is engaged in the business of renting linens to restaurants and other institutions. In late 1995, its then sales representative, Douglas Ross,[4] in an effort to obtain the account of the defendants, which operated restaurants and a bakery south of Boston, approached Gregory Acerra, an owner and manager of the defendants. The defendants were at that time renting table linens and chefs' uniforms from another company, with which they were "generally satisfied." A paramount concern of Acerra was that there be no minimum or flat fees. He was only willing to pay for linens actually used; if this arrangement was not possible, he was not interested. Both Ross and Acerra testified to this effect, Ross adding that his superior, Eugene Berthiaume, agreed, saying, "That's fine. Get the account."

---

[2]The defendants' brief indicates that the judge had agreed to be bound by the jury's determination.

[3]General Laws c. 93A, § 11, as amended through St. 1986, c. 363, § 2, provides in relevant part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act . . . may, as hereinafter provided, bring an action in the superior court, . . . whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."

[4]Ross no longer was employed by the plaintiff at the time of trial. He had fallen from the graces of both the plaintiff and the defendants and testified under subpoena.

Three documents on a printed form contract used by the plaintiff for its rentals were signed by Acerra and admitted in evidence.[5] Two were signed by Ross; the signature on behalf of the plaintiff on the third is not clear, and the document may have been signed by Berthiaume, the plaintiff's sales manager. The reverse side of each form contained a number of provisions, including one which provided that the term of the contract was forty-eight months. It also included the following:

> "8. INVENTORY CHARGE: It is agreed that, at the Company's option, a minimum weekly stock availability charge may be made based upon the Customer's total stock of each article. The Customer's total stock shall be defined to be that shown on the Company's records pertaining to the Customer as of the last day of the immediately preceding week. If charges based upon actual use exceed the minimum availability charge, actual charges only shall be payable."

The front of the forms had a column headed "flat rate or minimum charge."

When signed by Acerra, the columns were blank and had no figure as to a minimum charge. Berthiaume, or Ross, however, after the signed forms were received, inserted figures in this column (they appear on two of the three documents). The documents were placed in the plaintiff's files and copies were never sent to the defendants. According to the plaintiff's general manager, the minimum charge, although usually a standard flat rate of forty-five per cent for such items as uniforms, was a negotiable figure and the rate could be negotiated to "thirty or something like that." Acerra checked the first invoices, which did not contain a minimum, but did not check later invoices.

Sometime in the spring of 1996, Acerra asked Ross if the plaintiff would be interested in providing linens for three restaurants that would be open only in the summer. Since they were seasonal, Acerra did not want to sign a contract and be bound for four years. A few days later, Ross called back and

---

[5]The plaintiff claimed that the signed forms submitted by Acerra were offers that the plaintiff had to accept. For the purposes of this opinion, nothing turns on that characterization.

said there was no need for a contract. The plaintiff provided linens for the three seasonal restaurants and submitted invoices for payment.

In July, 1996, Acerra was informed by his partner that there was a "big problem" with the linen bills. Acerra then discovered that the defendants were being charged minimum fees. He noticed, for example, that one of the invoices showed that the defendants were billed for 119 chef coats, but only thirty-six had been delivered; another showed they were charged for 116 chef coats, while only forty had been delivered; they were charged for ninety pairs of pants, but none had been delivered.[6]

Acerra immediately called Ross, who agreed that these charges should not have been made. He said he would get back to Acerra, but he never did.[7] Acerra called Berthiaume, stating, "you guys have ripped me off." The two men met twice to go over invoices, and Acerra said he would not make any payments until the matter was resolved. Because they had not finished going through the invoices, they scheduled a third meeting, but Berthiaume canceled. He never contacted Acerra as promised and left the matter unresolved.

In November, 1996, after not receiving payments for ninety days, Berthiaume called. Acerra agreed to pay for linens currently delivered, but not for the arrears. On February 21, 1997, the plaintiff's general manager called Acerra and demanded that $5,000 be paid that day. Acerra refused and said he would not pay until the arrearage question was resolved. The next day, a Saturday, without advance notice, the plaintiff sent its trucks and removed all the linens from the defendants' premises. The defendants had to scramble and borrow linens from other restaurants to be able to open that weekend. The defendants did not hear from the plaintiff until it filed this action in August, 1999.

Prior to trial, Acerra went through all the invoices. His calculations, introduced as an exhibit, showed that the

[6]Additional overcharges came to light later. Berthiaume admitted the plaintiff had charged the defendants one hundred per cent of the cost of new napkins although the napkins had been rented for fifteen months and the signed document required a lesser charge.

[7]It appears that Ross left the employ of the plaintiff at about this time.

defendants had overpaid $13,518.71 through September, 1996, and had been overbilled $14,376.22. He acknowledged that after adjusting for the overpayments and the overbillings, the defendants owed the plaintiff $8,800. The jury adopted Acerra's figures. In answers to special questions, the jury found that the plaintiff did not fully perform its obligations under the contracts. The plaintiff, however, was entitled to recover in quantum meruit the sum of $8,800, the amount Acerra conceded was owing. On the defendants' counterclaim, the jury found that the plaintiff had breached its contracts with the defendants, and that its breach caused the defendants damages of $13,518.71 (the amount Acerra calculated to have been overpaid). The jury found that the plaintiff had committed unfair or deceptive acts, and that the resulting damages were $13,518.71; moreover, as indicated earlier, the jury found that the plaintiff's actions were wilful and knowing. They determined that "2" was the appropriate multiplier. The judge entered an amended judgment on the plaintiff's posttrial motion, increasing the award to the plaintiff by $13,518.71.[8]

2. *Chapter 93A violation.* Pointing to the jury's determination that the damages under G. L. c. 93A (before doubling) overlapped the damages for breach of contract, the plaintiff argues that there was here merely a breach of contract and no violation of c. 93A. Contrary to the plaintiff's contention, we consider the jury warranted in finding the plaintiff's actions unfair or deceptive, and not just a contract claim. The plaintiff obtained the defendants' business by representing to them that no minimum or flat fees would be charged. Both Ross and Acerra confirmed that the arrangement would not have been entered into if there were minimum or flat fees. See *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 777 (1980), quoting from *Lowell Gas Co.* v. *Attorney Gen.,* 377 Mass. 37, 51 (1979) (conduct may be " 'deceptive' if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted' "); *Aspinall* v. *Philip Morris Cos.,* 442 Mass. 381, 394 (2004). The plaintiff inserted a figure for minimum fees in the document

---

[8]The additur (which the defendants accepted) was ordered because the jury's damage award to the plaintiff had given the defendants full credit for the overpayments, and had also awarded the defendants the same amount as damages, thus resulting in a double credit.

signed by Acerra, put the document in its files without ever informing Acerra of the changes, and then charged the defendants minimum fees. The plaintiff's actions, the jury found, were wilful or knowing.[9]

3. *Chapter 93A damages.* Based on the concession of the defendants that they owed the plaintiff money even after setting off the amounts overpaid and overbilled, the plaintiff argues the defendants have suffered no loss of money or property as required by G. L. c. 93A, § 11. See note 3, *supra.* Although it does not appear that Massachusetts courts have dealt precisely with the question of setoff, the analysis of the Supreme Judicial Court in *Wolfberg* v. *Hunter*, 385 Mass. 390, 399-400 (1982), provides strong support for the procedure followed here, that is, doubling the c. 93A damages before considering the amount owing to the plaintiff.

*Wolfberg* was a summary process action brought by a landlord for nonpayment of rent. The defendants had informed the landlord that the conditions in their apartment, an infestation of rodents, were in violation of the State sanitary code. *Id.* at 391. Dissatisfied with the landlord's attempts to remedy the problem, the tenants had withheld the rent pursuant to G. L. c. 239, § 8A, which permits tenants to withhold rent when conditions in their apartments are in violation of the State sanitary code. The tenants counterclaimed in the summary process action, claiming, inter alia, violations of c. 93A. The trial judge found such violations and initially computed the c. 93A damages as the difference between the rental value of the apartment as warranted, i.e., without the infestation for the five months in question, and the value of the apartment in its defective condition, plus the expenses incurred by the tenants in their efforts to remedy the defective condition. The judge doubled the damages, finding lack of good faith by the landlord in response to the tenants' c. 93A demand letter. *Id.* at 397. On motion of the landlord, the judge, however, recalculated the damages, and determined that the tenants were not entitled to any award for the months during which they withheld rent. The Supreme Judicial Court held this was error, and that it was counter to the policies of c. 93A and

---

[9]As indicated earlier, see note 6, *supra*, the plaintiff also charged the defendants for napkins beyond the price indicated in the documents.

G. L. c. 239, § 8A, to deny recovery under c. 93A for defective conditions in rental units for those months during which tenants were withholding rent. *Id.* at 398. Recognizing that it would be unfair to allow tenants who have withheld rent to recover the same amount of damages as those who have not, the court held that the damages for tenants who have withheld rent either under G. L. c. 239, § 8A, or under the common law and who prevail in a claim for damages under c. 93A should be calculated as originally determined by the trial judge, and should be doubled or trebled if the judge finds that the unfair or deceptive act was wilful or knowing. *Id.* at 399. "From this figure, the total amount of rent withheld shall be subtracted to prevent an excessive recovery." *Id.* at 400.

The result here is also in accord with cases elsewhere involving statutes that permit double or treble damages, whether they be under the Racketeer Influenced and Corrupt Organizations Act (RICO), the Sherman Antitrust Act, or the False Claims Act. In these cases, the courts set off amounts received by the wronged party or owed to the wrongdoer only *after* doubling or trebling the damages.[10]

As stated in *Baldassari* v. *Public Fin. Trust*, 369 Mass. at 40-

---

[10]In *Liquid Air Corp.* v. *Rogers*, 834 F.2d 1297, 1301 (7th Cir. 1987), cert. denied, 492 U.S. 917 (1989), involving RICO, 18 U.S.C. § 1962 (2000), the defendants, after a hearing on posttrial motions, revealed that they had 530 Liquid Air cylinders, and sought to return them to offset the judgment. The trial court subtracted the rental and replacement value of the belatedly returned cylinders from the already trebled damages. *Id.* at 1310. The defendants argued that the cost of the returned cylinders should have been subtracted before trebling. The court disagreed, saying the return of the cylinders "does not negate the frauds perpetrated by defendants. We conclude that setting-off damages *after* trebling is more likely to effectuate the purposes behind RICO" (emphasis in original). *Ibid.* In *United States* v. *Bornstein*, 423 U.S. 303 (1976), the United States sued a subcontractor under the False Claims Act then in effect, which provided that a person presenting a false claim for payment by the United States, "shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by" the presentation of such claim. *Id.* at 305 n.1, quoting from Rev. Stat. § 3490 (1878). The United States had recovered damages from the prime contractor because of the subcontractor's fraud. The United States Supreme Court held that "the Government's damages should be doubled before any compensatory payments are deducted," saying that "that method of computation most faithfully conforms to the language and purpose of the Act." *Id.* at 314. Noting that "[t]he statute speaks of doubling 'damages' and not doubling 'net damages,' "

41, c. 93A "was designed to meet a pressing need for an effective private remedy, and . . . traditional technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice." See *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 316 (1991), where the court emphasized that "the scheme of the statute and the Legislature's manifest purpose" is to deter misconduct and that affording both private and public parties remedial incentives are

*id.* at 314 n.10, the Court pointed out that such computation "maximizes the deterrent impact of the double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision," *id.* at 317, that is, it "fixes the liability of the defrauder without reference to the adventitious actions of other persons." *Id.* at 315. In *Flintkote Co.* v. *Lysfjord*, 246 F.2d 368 (9th Cir.), cert denied, 355 U.S. 835 (1957), an action under the Sherman Antitrust Act, the statute, 15 U.S.C. § 15 (2000), provided: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained . . . ." *Id.* at 397. The plaintiffs settled with some coconspirators for $20,000 after the action was filed but before trial, expressly reserving all rights against Flintkote. The question before the court was "whether the $20,000 should be subtracted from the actual damages fixed by the jury verdict ($50,000)" (the settlement was withheld from the jury) or from the trebled amount of $150,000. *Ibid.* The court held that "a plaintiff is entitled to one full satisfaction of his claim . . . [and] such satisfaction would not be achieved by the award of any sum, which [when] added to the settlement sum, did not total $150,000." *Id.* at 398. The court also pointed out that this computation fosters the policy of the act. *Ibid.* Even where the actual damages of claimants have been satisfied, their RICO claims have been held assignable. See *In re Natl. Mort. Equity Corp. Mort. Pool Certificates Sec. Litigation*, 636 F. Supp. 1138, 1151-1152 (C.D. Cal. 1986), where the assignment to a bank of a RICO claim of third parties was upheld even though the bank had paid the third parties' total damages because of a RICO claim against it. The bank's payments, however, would be an offset against any treble damage award. In *Visiting Nurse Assn.* v. *Thompson*, 378 F. Supp. 2d 75, 97 (E.D.N.Y. 2004), the government had recouped the entire amount of its damages. The court, after suggesting that the False Claims Act, 31 U.S.C. §§ 3729(a)-3733 (2000), did not require that there be actual damages, held that even if there is an actual damage requirement under the Act, "that component is satisfied where the government has paid out money in reliance upon the accuracy of a reimbursement claim, and only later recouped the overpayment. The [plaintiffs were] therefore liable under the treble damage provision of the Act." *Id.* at 98. See *Esparza* v. *Specht*, 55 Cal. App. 3d 1, 6-9 (1976), where although California requires a showing of actual damages before punitive damages can be awarded, the court held that damages must be shown but "not bottomline damages, i.e., damages over and above all the cross-claims of the perpetrator of the fraud." *Id.* at 9. See also Dobbs, Remedies § 3.12 (2d ed. 1993).

essential to the enforcement of the statute. "Like other statutes containing multiple damage provisions, [G. L. c. 93A,] §§ 9 and 11[,] reflect 'the Legislature's displeasure with the proscribed conduct and its desire to deter such conduct and encourage vindicative lawsuits.' " *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 857 (1983), quoting from *McGrath* v. *Mishara*, 386 Mass. 74, 85 (1982).

Based on the analysis in *Wolfberg* v. *Hunter*, 389 Mass. at 399-400, on the analogous cases involving the RICO, False Claims, and antitrust statutes, and on the policy of deterrence as evidenced in the multiplication of damages in c. 93A, we conclude that the proper construction of G. L. c. 93A, § 11, is that where multiplication is warranted, the multiplication is first applied to the "loss of money or property" caused by unfair conduct, and only thereafter are any offsets or amounts recouped to be considered.

4. *Parol evidence.* Prior to trial, the plaintiff filed a motion in limine to preclude evidence of the discussions between Ross and Acerra on the ground that such evidence was not admissible to vary the terms of an integrated contract reduced to writing. See *Hogan* v. *Riemer*, 35 Mass. App. Ct. 360, 364-365 (1993). Pointing to paragraph 8 appearing on the reverse side of the contract, see part 1, *supra*, the plaintiff claims that Acerra should have deleted that paragraph before signing the contract if he did not want to be bound by it. As the judge correctly observed, however, paragraph 8 was not a sufficiently definite contract term — it was "wide open." Paragraph 8 disclosed neither whether there would be charges nor, if there were charges, what their amount would be. There was no error in ruling that the contract term was not definite enough to preclude parol evidence.

5. *Exclusion of contracts for summer restaurants.* The plaintiff attempted to introduce eleven contracts pertaining to its rental services, but was allowed to introduce only three. The other eight were excluded because Acerra denied that his signature appeared on the documents, and the judge considered them not to be relevant unless there was some evidence that the signatures were not forged. Even if this ruling was erroneous, which we do not decide, there was here no prejudice. The terms of the

excluded contracts were the same as those in the contracts in evidence. On the claims based on the contracts in evidence, the plaintiff recovered not on the contracts but in quantum meruit. It recovered on the same basis for the services provided to the summer restaurants, and it has not shown any reason why the result would have been different had the excluded contracts been admitted.

6. *Other claims.* Contrary to the plaintiff's contention, the defendants did not obtain a double recovery. The judgment only awarded the defendants damages under the c. 93A claim, and nothing additional under the contract claim.

The remaining claims are totally without merit.[11]

> *Judgment entered October 27, 2003, affirmed.*

---

[11]Within fourteen days of the issuance of the rescript of this opinion, defendants may apply to the panel that heard and decided this appeal for an award of appellate attorney's fees and costs, in the manner described in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004).