MARCIA RHODES & others[1] *vs.* AIG DOMESTIC CLAIMS, INC., & others.[2]

Suffolk. October 6, 2011. - February 10, 2012.

Present: IRELAND, C.J., SPINA, CORDY, & BOTSFORD, JJ.

*Insurance,* Settlement of claim, Unfair act or practice. *Consumer Protection Act,* Insurance, Damages, Unfair or deceptive act. *Statute,* Construction. *Damages,* Consumer protection case, Punitive.

Statement regarding the continuing vitality of the rule that the plaintiffs in a civil action to recover against an insurer under G. L. c. 93A, § 9, for an unfair claim settlement practice need only prove that they suffered a loss, or an adverse consequence, due to the insurer's failure to make a timely, reasonable offer. [495-497]

This court concluded, based on the language and history of a 1989 amendment to G. L. c. 93A, that the damages that the plaintiffs in a civil action were entitled to recover under G. L. c. 93A, § 9, on account of a violation of G. L. c. 93A, § 2, and G. L. c. 176D, § 3 (9) (*f*), arising from the failure of the defendants (an excess insurer and its claims administrator) to make a prompt settlement offer after jury verdicts entered in favor of the plaintiffs in a tort action against the defendants' insureds, must be based on the underlying judgment in the plaintiffs' tort action against the defendants' insureds and not the loss of use of the sum ultimately included in the defendants' late-tendered settlement offer months after the jury's verdicts. [497-505]

A Superior Court judge did not err in concluding that a primary insurer, by promptly tendering its policy limits to an excess insurer's claims administrator when it was clear that the case would not settle for an amount within the primary policy limits, satisfied its duty under G. L. c. 176D, § 3 (9) (*f*), to effectuate a prompt, fair, and equitable settlement with the plaintiffs in a civil action. [505-506]

CIVIL ACTION commenced in the Superior Court Department on April 7, 2005.

The case was heard by *Ralph D. Gants,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

[1]Harold Rhodes and Rebecca Rhodes.

[2]National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and Zurich American Insurance Company.

*Margaret M. Pinkham & M. Frederick Pritzker (Daniel J. Brown* with them) for the plaintiffs.

*John P. Ryan (Anthony R. Zelle* with him) for AIG Domestic Claims, Inc., & another.

*Linda L. Morkan,* of Connecticut (*Gregory P. Varga* with her) for Zurich American Insurance Company.

*Michael F. Aylward & Richard R. Eurich,* for American Insurance Association, amicus curiae, submitted a brief.

BOTSFORD, J. The issues in this appeal relate to insurance claims settlement practices of a primary and an excess insurance carrier. Marcia Rhodes[3] received catastrophic injuries including permanent paraplegia when a tractor trailer hit the rear end of her car in January of 2002. She; her husband, Harold; and her daughter, Rebecca (collectively, plaintiffs or family) brought a tort action against, among others, the truck driver, his employer, and the company to which he was assigned by his employer, seeking damages for Marcia's injuries and loss of consortium on the part of Harold and Rebecca. At trial, which took place in September of 2004, the plaintiffs secured a judgment of approximately $11.3 million. The plaintiffs had made settlement demands on the primary and excess insurers of the company to whom the truck driver was assigned before the tort trial, but no settlement was forthcoming. Eight and one-half months after the jury's verdicts and while the defendants' appeals were pending, the insurers and the plaintiffs settled the tort action, and the appeals were withdrawn.

Before the settlement was reached in the tort action, the plaintiffs brought the present action against the two insurers under G. L. c. 93A, § 9, and G. L. c. 176D, § 3 (9) (*f*), for failing to effect a prompt, fair, and equitable settlement of the plaintiffs' claims. Following a lengthy bench trial, a judge in the Superior Court determined that the primary insurer, Zurich American Insurance Company (Zurich), was not liable on the plaintiffs' claims of unfair settlement practices, but that the excess insurer, National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), and more particularly

---

[3]For ease of reference we refer to the family members in this case by their first names.

its claims administrator, the defendant AIG Domestic Claims, Inc. (AIGDC),[4] had engaged in wilful and knowing violations of G. L. c. 93A (c. 93A), and G. L. c. 176D (c. 176D), both before the trial in the tort action and after judgment entered in it. The judge, however, concluded that the plaintiffs could not recover for preverdict violations because they had not proved that the unfair or deceptive acts complained of before trial had caused them any "actual damages," or injury. In connection with the postjudgment violation, the judge awarded damages — doubled because of the violation's wilful and knowing character — based on the plaintiffs' loss of use of the funds that they accepted in postjudgment settlement of their claims (i.e., interest on those funds).

The plaintiffs appealed to the Appeals Court. See *Rhodes* v. *AIG Domestic Claims, Inc.*, 78 Mass. App. Ct. 299 (2010). Disagreeing with the trial judge, a divided panel of that court concluded that with respect to AIGDC's preverdict conduct in the tort action, "the causal link between AIGDC's unfair settlement practices and injury to the plaintiffs was sufficiently established" because AIGDC's conduct deprived the plaintiffs of "the opportunity to engage in a timely settlement process," "compound[ed] their frustrations and fears," and "exacerbat[ed] their losses." *Id.* at 309, 310, 311. A majority of the panel further determined that the measure of damages for the preverdict violation should be the loss of use of the funds AIGDC had offered in settlement before the trial, reasoning that permitting insurers to limit their c. 93A and c. 176D liability to loss of use by making a reasonable, but tardy, offer was in keeping with c. 176D's purpose of encouraging out-of-court settlements of insurance claims.[5] *Id.* at 312. The Appeals Court also awarded loss of use damages for AIGDC's postjudgment violation. *Id.* at 315.

---

[4]Because AIG Domestic Claims, Inc. (AIGDC), handled all the administration of the plaintiffs' claims on behalf of the excess insurer National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), we refer to these two defendants collectively as AIGDC. Both AIGDC and National Union are liable for AIGDC's violations of G. L. c. 93A (c. 93A).

[5]Justice Berry wrote separately, concluding that loss of use was not necessarily the appropriate measure of damages where, as here, the insurers' proffered settlement was not accepted, and that, in any event, AIGDC's last pretrial settlement offer was neither fair nor reasonable. In her view, AIGDC could be liable for damages up to the amount of the jury verdicts in the tort action. See *Rhodes*

The case is before us on the plaintiffs' application for further appellate review. We conclude that the damages the plaintiffs are entitled to recover under c. 93A, § 9, on account of the defendants' postjudgment violation of c. 93A, § 2, and c. 176D, § 3 (9) (*f*), must be based on the underlying judgment in the plaintiffs' tort action, and not the loss of use of the sum ultimately included in AIGDC's late-tendered settlement offer months after the jury's verdicts. This conclusion makes it unnecessary to determine whether AIGDC's wilful and knowing violation of the applicable statutes before the verdicts in the tort case caused injury to the plaintiffs, because even if, as they argue, the plaintiffs did establish the requisite causal link between AIGDC's preverdict violations and injury and thereby are entitled to a multiple of the underlying tort judgment as damages, the plaintiffs may not recover that amount twice. We affirm the judge's determination that Zurich did not violate c. 93A and c. 176D, and is not liable to the plaintiffs.[6]

1. *Background.*[7] a. *The accident.* There has never been a dispute that Marcia's accident was caused by the negligence of the truck driver, with no contributory negligence on her part. The force of the eighteen-wheel truck's crash into the back of Marcia's car fractured her spinal cord, rendering her paraplegic, and broke several of her ribs. Marcia was hospitalized from the day of the accident, January 9, 2002, until April 16, 2002, after undergoing spinal fusion surgery and two months of rehabilitation. Even after returning home, she could not move from her wheelchair to her bed or the toilet on her own. In May, 2002, she had emergency surgery to remove her gall bladder due to gangrene and spent another three weeks recovering in a hospital. In December, 2002, Marcia developed pressure sores and was bedridden for ten months, until October, 2003.

b. *The tort action.* Driver Logistic Services (DLS) had assigned Carlo Zalewski, its employee, to drive the truck involved in the accident for GAF Building Corp. (GAF). The truck was

v. *AIG Domestic Claims, Inc.*, 78 Mass. App. Ct. 299, 317 (2010) (Berry, J., concurring in part and dissenting in part).

[6]We acknowledge the amicus brief of the American Insurance Association.

[7]The facts recited are primarily taken from the judge's findings of fact in the c. 93A action, supplemented by references to undisputed testimony of certain witnesses at trial.

owned by Penske Truck Leasing Company (Penske) and leased to GAF. GAF held a $2 million primary automobile insurance policy with Zurich and a $50 million excess umbrella policy with National Union. AIGDC was National Union's claims administrator and managed the plaintiffs' excess insurance claim.

After investigation, on April 8, 2002, GAF's third-party claims administrator, Crawford & Company (Crawford), informed GAF, Zurich, and AIGDC in writing that Zalewski clearly was liable for Marcia's injuries and that his liability could be imputed to GAF. By July 3, 2002, GAF had determined that its policies with Zurich and National Union covered GAF, Zalewski, DLS, and Penske (collectively, GAF-insured defendants) for the accident.

On July 12, 2002, the plaintiffs filed their negligence action against the GAF-insured defendants in the Superior Court. On September 25, in a facsimile sent directly to David McIntosh, a claims director at Zurich, Crawford estimated the value of the case to be between $5 million and $10 million.[8] On November 21, Zalewski admitted to facts sufficient to support guilt on a criminal charge of operating negligently to endanger. Thereafter, on July 22, 2003, counsel for the plaintiffs made an oral settlement demand of $18.5 million. Approximately three weeks later, on August 13, the plaintiffs submitted a written settlement demand of $16.5 million.[9]

On December 19, 2003, the claims director for Zurich asked for approval before the end of the year to tender Zurich's $2 million policy limits to AIGDC as excess insurer, noting in her report that the probability of a plaintiffs' verdict was one hundred per cent, and there was no possibility of a comparative negligence reduction. After receiving authorization, the claims director orally tendered the limits to AIGDC in a telephone call on January 23, 2004. The AIGDC representative responded that he needed the tender in writing (despite knowing as early as

---

[8]The Crawford & Company (Crawford) adjuster who made this estimate was succeeded by another adjuster who, in May of 2003, made the same estimate.

[9]The demand included incurred medical expenses of $413,977.68, present value of future medical costs of $2,027,078, loss of household services of $292,379, and out-of-pocket expenses of $83,984.74. This offer was lower than the July, 2003, demand because the calculation of incurred medical expenses showed that they were lower than initially anticipated or projected.

November of 2003 that the tender would be made), and the tender of the Zurich policy was made formally in writing on March 29, 2004. No information was communicated to the family regarding this tender. Zurich continued to pay defense costs for the litigation[10] because AIGDC claimed that it had no defense obligation under its excess policy, but Zurich reserved the right to recover the defense costs from AIGDC. Nonetheless, AIGDC participated in the defense and hired the law firm of Campbell & Campbell in December, 2003, to serve as cocounsel for the GAF-insured defendants. In June, 2004, Campbell & Campbell took over as lead counsel.

On March 4, 2004, several GAF representatives met with their attorneys and a representative of AIGDC to discuss the results of jury verdict and settlement research. Among comparable automobile accident cases, mostly in Massachusetts, the average settlement was over $6.6 million, and the average verdict was over $9.6 million. Sometime between March 29, 2004, and the pretrial conference in the negligence action on April 1, 2004, the GAF-insured defendants made their first settlement offer to the family — Zurich's $2 million policy limits to settle the entire case. The plaintiffs' attorney thought the offer was wholly inadequate, and the family rejected it without making a counteroffer. Nevertheless, the plaintiffs agreed in mid-April to mediate the case. AIGDC did not want to mediate at that time, stating that it needed further discovery although discovery had closed more than six months before. The judge, however, did not accept AIGDC's proffered justification, finding:

> "The fact of the matter is that AIGDC[] did not delay its settlement offer in order to conduct the [independent medical evaluation] or to depose [Marcia] or to obtain [her] psychological records; it delayed its settlement offer because it did not want to make any offer until mediation and it wanted, for strategic purposes, to wait until nearly the eve of trial to mediate the case."

Because of AIGDC's wish for delay, at its direction, the mediation did not occur until August 11, 2004, less than one month

---

[10]Zurich hired the law firm of Nixon Peabody LLP to represent the GAF-insured defendants.

before the September 7 trial date that had been set the previous April.

In connection with the mediation, AIGDC authorized its representative to make an offer of up to $3.75 million to settle the case on behalf of the GAF-insured defendants[11]; AIGDC expected there would be an additional $1 million coming from the insurer of Professional Tree Service.[12] Once at the mediation, the family proffered an initial demand of $15.5 million, plus payment of Marcia's health insurance premiums for the rest of her life. The AIGDC representative responded with an offer of $2.75 million. The family countered with a demand of $15 million, and AIGDC then offered $3.5 million. During the mediation, the family separately reached a settlement with Professional Tree Service for $550,000. Despite learning that this settlement was less than expected, the AIGDC representative did not seek authorization to offer more in settlement on behalf of the remaining defendants. In fact, he never even increased AIGDC's offer to the $3.75 million that he had been authorized to offer before the mediation began. About one hour after making the $3.5 million offer, the defendants left the mediation.

Between the mediation and the beginning of trial on September 7, 2004, there were no further settlement negotiations, and no further offers from any of the tort defendants. The GAF-insured defendants other than Penske stipulated to their liability just prior to trial, and the parties stipulated to the dismissal of all claims against Penske during trial. Accordingly, the only issue for the jury was determination of the amount of damages. At the close of the evidence, concluding the trial had gone better for the plaintiffs than expected, the AIGDC representative made a settlement offer of $6 million, which included the $2 million Zurich policy but not the Professional Tree Service settlement of $550,000. The plaintiffs' counsel did not communicate the offer to the family, thus effectively rejecting it on their behalf. The jury returned verdicts for the plaintiffs on September 15, 2004, awarding damages totaling $9.412 million. The total amount

---

[11]This figure included the $2 million Zurich policy plus $1.75 million from the AIGDC excess policy.

[12]Professional Tree Service was the company working near the accident site. It held a $1 million insurance policy.

included $7.412 million for Marcia, $1.5 million for Harold in loss of consortium damages, and $500,000 for Rebecca in consortium damages. After deducting the $550,000 settlement with Professional Tree Service and adding statutory interest, the judgment that entered against the remaining GAF-insured defendants on September 28, 2004, was approximately $11.3 million. On October 18, these defendants moved for a new trial or, in the alternative, remittitur; they also filed notices of appeal on November 10. The motions for a new trial or remittitur were denied on November 17.

c. *The c. 93A action and settlement of the tort action.* On November 19, 2004, the plaintiffs sent demand letters to Zurich and AIGDC pursuant to G. L. c. 93A, § 9, alleging that they had failed to effectuate a prompt and equitable settlement of the family's accident claims in violation of G. L. c. 176D, § 3 (9) (*f*). AIGDC responded to the demand letter on December 17, 2004, offering $7 million (including Zurich's $2 million) to settle the underlying tort suit as well as the plaintiffs' c. 93A claims. Zurich responded on December 22, 2004, by paying the family $2,322,995.75 without receiving any release of the c. 93A claim against it. The family then filed the present c. 93A action against AIGDC and Zurich on April 7, 2005. AIGDC and the family settled the negligence action for $8.965 million on June 2, 2005. Pursuant to the settlement agreement, the remaining GAF-insured defendants dropped their appeals from the judgment in that action, but the plaintiffs retained their c. 93A claims against AIGDC and Zurich.

At the subsequent bench trial of the c. 93A action in 2007, each side presented the testimony of an expert witness regarding the promptness and reasonableness of the settlement offers made by the insurers. As stated, the judge found that Zurich did not violate c. 176D, § 3 (9) (*f*), or c. 93A, but that AIGDC had violated its duty under c. 176D, § 3 (9) (*f*) (and derivatively c. 93A), to effectuate a prompt, fair, and equitable settlement before trial of the plaintiffs' tort action and again following judgment in that case. In particular, with respect to the pretrial violation, the judge found that (1) AIGDC wilfully and knowingly committed a breach of its duty to make a prompt settlement offer once liability (including damages) was reasonably clear;

(2) AIGDC should have made a fair, reasonable offer by May 1, 2004; but (3) AIGDC's failure to do so did not cause the family to suffer any actual damages because, in his view, the evidence indicated the family would not have accepted even a timely reasonable offer and, therefore, would have proceeded to trial in any event. As for the postjudgment violation, the judge determined that AIGDC wilfully and knowingly violated its duty to effectuate a prompt and fair settlement after the jury verdict in the tort case, characterizing AIGDC's December, 2004, postjudgment settlement offer of $7 million in response to the plaintiffs' c. 93A demand letter as "not only unreasonable, but insulting." On this postjudgment claim, he awarded loss of use damages of $448,250, calculated as the lost interest on the ultimate $8.965 million settlement between the date the negligence case should have settled in January, 2005, and the date it actually did settle, in June of 2005.[13]

2. *Discussion.* The statutory framework governing the plaintiffs' claims in this case is well known. An insurance company commits an unfair claim settlement practice if it "[f]ail[s] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." G. L. c. 176D, § 3 (9) (*f*). "[A]ny person whose rights are affected by another person violating the provisions of [G. L. c. 176D, § 3 (9) (*f*),]" is entitled to bring an action to recover for the violation under G. L. c. 93A, § 9.[14] If there is a finding in such an action that

---

[13]The judge calculated the interest at the postjudgment rate of one per cent per month. He multiplied the amount for which the plaintiffs ultimately settled, $8.965 million, by .05 to arrive at $448,250. The judge then doubled this amount because of the wilful and knowing character of the violation. AIGDC also was required to pay the family's reasonable attorney's fees and costs, as provided for by G. L. c. 93A, § 9. This fee award is not at issue in this appeal.

[14]General Laws c. 93A, § 9 (1), provides:

"Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of [G. L. c. 176D, § 3,] may bring an action in the superior court . . . whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."

the insurer has failed to effectuate a prompt, fair, and equitable settlement causing injury, the plaintiff is entitled to the greater of actual damages or statutory damages of twenty-five dollars. G. L. c. 93A, § 9 (3). However, if the judge finds the insurer's action was wilful or knowing (or, as here, both), the judge must grant double or treble damages. *Id.*

In this appeal, the plaintiffs challenge the judge's determination that AIGDC's unfair or deceptive conduct before trial did not cause them injury, and his calculation of damages for both the pretrial and posttrial conduct.[15] We consider the two claims separately.

a. *AIGDC's pretrial conduct.* "We review a judge's findings of fact under the clearly erroneous standard and his conclusions of law de novo." *Casavant* v. *Norwegian Cruise Line Ltd.,* 460 Mass. 500, 503 (2011). Several decisions of this court have established that an insurer has the burden to prove that its settlement offer was reasonable, and a plaintiff need not prove that she would have accepted a reasonable offer, had one been made. "An insurer's statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer. . . . Accordingly, quantifying the damages . . . does not turn on whether the plaintiff can show that she would have taken advantage of an earlier settlement opportunity." (Citation omitted.) *Hopkins* v. *Liberty Mut. Ins. Co.,* 434 Mass. 556, 567 (2001) (*Hopkins*). See *Bobick* v. *United States Fid. & Guar. Co.,* 439 Mass. 652, 662-663 (2003) (*Bobick*) ("The judge's . . . decision was based, in part, on the plaintiff's failure to demonstrate that he would have been willing to accept a reasonable settlement offer at any time before trial. This is incorrect").

The judge, however, concluded that this court's decision in *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston,* 445 Mass. 790 (2006) (*Hershenow*), overturned this principle. The judge stated:

"[S]ince there can be no adverse consequence or loss

---

[15]AIGDC does not contest here the judge's findings that its conduct before and after the entry of judgment in the tort action constituted knowing and wilful violations of c. 176D, § 3 (9) (*f*), and c. 93A, § 9. AIGDC's lack of contest is reasonable, because the trial record provides ample support for the judge's findings.

> from the failure of an insurer to make a prompt and reasonable settlement offer if the plaintiff would have rejected that offer, *Hershenow*, although not an insurance case, must stand for the proposition that a plaintiff, to prevail on a Chapter 93A/Chapter 176D claim, must prove not only that the insurer failed to make a prompt or reasonable settlement offer but also that, if it had, the plaintiff would have accepted that offer and settled the actual or threatened litigation."

We disagree that *Hershenow* changed our c. 93A jurisprudence generally, or the legal framework governing claims of unfair or deceptive claims settlement practices in particular.

*Hershenow* reaffirms the established principle that to recover under c. 93A, § 9, a plaintiff must prove causation — that is, the plaintiff is required to prove that the defendant's unfair or deceptive act caused an adverse consequence or loss.[16] *Id.* at 798, 800. This is far from a new or even amended interpretation of c. 93A. See, e.g., *R.W. Granger & Sons* v. *J & S Insulation, Inc.*, 435 Mass. 66, 80-81 (2001) (*Granger*), and cases cited ("We have interpreted the statute, before and after the 1989 amendment, to require a plaintiff who seeks damages under G. L. c. 93A to establish a causal link between the insurer's wrongful conduct and the loss a plaintiff claims to have suffered"); *Hopkins*, 434 Mass. at 567 n.17 (referring to "the obvious rule that, in order to recover actual damages under G. L. c. 93A, § 9, there must be a causal relationship between the alleged unfair act and the claimed loss"). See also *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 630-631 (2008) (discussing and factually distinguishing *Hershenow* because latter was case where no harm was caused).

---

[16]In *Hershenow*, two consumers sued the defendants, rental car companies, alleging that their form contracts contained language contrary to the requirements of G. L. c. 90, § 32E ½; the challenged language purported to reduce the protections available to the plaintiffs under the collision damage waiver in the companies' rental contracts in alleged violation of this statute. *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 792-793 (2006). Because none of the automobiles rented by the plaintiffs suffered collision damage during any of the plaintiffs' rental periods, however, the court held that the defendants' deceptive acts did not cause injury to the plaintiffs and therefore summary judgment was properly entered for the defendants. *Id.* at 791-792.

As the judge noted, *Hershenow* is not an insurance case and does not deal with the interaction between c. 93A and c. 176D, § 3 (9) (*f*). Nothing in *Hershenow* supports the conclusion that our decision in that case was intended to change the law and place a new burden on plaintiffs to prove that they would have accepted a prompt, reasonable settlement offer, had the insurer made such an offer. Rather, as stated in *Hopkins* and *Bobick*, it has been and remains the rule that the plaintiffs need only prove that they suffered a loss, or an adverse consequence, due to the insurer's failure to make a timely, reasonable offer; the plaintiffs need not speculate about what they *would* have done with a hypothetical offer that the insurers might have, but in fact did not, make on a timely basis. See *Bobick*, 439 Mass. at 662-663; *Hopkins*, 434 Mass. at 567.

The Appeals Court applied the principles stated in the *Hopkins* and *Bobick* cases in its analysis of the facts found by the judge, and the Appeals Court's conclusion that the plaintiffs did establish the requisite causal link between AIGDC's delayed settlement offer and actual injury to them is certainly reasonable. Ultimately, though, it is unnecessary for us to resolve the causation issue because, as we next explain, the plaintiffs are entitled to recover multiple damages based on the underlying tort judgment for AIGDC's postjudgment violation of c. 176D, § 3 (9) (*f*), and c. 93A.[17] The plaintiffs correctly do not suggest that they are entitled to recover twice for AIGDC's continuing failure to effectuate a prompt and reasonable settlement.

b. *Measure of damages.* We turn to the appropriate measure of damages to be awarded to the plaintiffs under c. 93A, an issue of law that we review de novo. See *Casavant* v. *Norwegian Cruise Line Ltd.*, 460 Mass. at 503. Before 1989, several decisions of this court and the Appeals Court held that the measure of damages for an insurer's failure to make a prompt, fair, and equitable settlement offer were the damages directly caused by the insurer's conduct — typically, loss of the use of such funds from the time when the claim should have been paid to the time

---

[17]Likewise, we need not decide whether, as the plaintiffs contend, a number of the judge's significant factual findings are clearly erroneous. In particular, the plaintiffs challenge the finding that the family would not have accepted an offer of less than $8 million on May 1, 2004.

that a settlement or judgment was paid — and not the total amount owed to the claimant under the insurance policy. See, e.g., *Bertassi* v. *Allstate Ins. Co.*, 402 Mass. 366 (1988) (*Bertassi*); *Wallace* v. *American Mfrs. Mut. Ins. Co.*, 22 Mass. App. Ct. 938 (1986) (*Wallace*); *Trempe* v. *Aetna Cas. & Sur. Co.*, 20 Mass. App. Ct. 448 (1985) (*Trempe*). If the insurer's conduct was wilful or knowing, loss of use damages were doubled or trebled.

In 1989, the Legislature amended c. 93A, §§ 9 and 11, with respect to the calculation of damages. See St. 1989, c. 580 (1989 amendment). Of particular significance to this case, after the 1989 amendment, c. 93A, § 9 (3), contains the following directive relating to multiple damages:

> "[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use of employment of the act or practice was a willful or knowing violation of [c. 93A, § 2] . . . . *For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence,* regardless of the existence or nonexistence of insurance coverage available in payment of the claim"[18] (emphasis supplied).

There is general consensus among courts and commentators that the 1989 amendment was intended to increase the potential penalties for insurers who engaged in unfair claim settlement practices, in response to the *Bertassi-Wallace-Trempe* line of cases. See *Kapp* v. *Arbella Mut. Ins. Co.*, 426 Mass. 683, 685-686 (1998); *Clegg* v. *Butler*, 424 Mass. 413, 424 (1997); *Yeagle* v. *Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. 650, 653-655 (1997); *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 755 (1996). See also Billings, The Massachusetts Law of Unfair Insurance Claim Settlement Practices, 76 Mass. L. Rev. 55, 71 (1991); Hailey, New Incentive for Insurers to Settle Claims Reasonably and Promptly, 34 Boston B.J. 16, 17 (1990).

---

[18]Section 11 of c. 93A contains identical language. The plaintiffs' claims against Zurich and AIGDC are brought only under c. 93A, § 9.

Under the plain language of the 1989 amendment, if a defendant commits a wilful or knowing c. 93A violation that finds its roots in an event or a transaction that has given rise to a judgment in favor of the plaintiff, then the damages for the c. 93A violation are calculated by multiplying the amount of that judgment.[19] In *Granger*, we adopted precisely this interpretation of the 1989 amendment. *Granger*, 435 Mass. at 81-82. The defendant-in-counterclaim in that case failed to make a prompt settlement offer after a jury verdict had entered in favor of the plaintiff-in-counterclaim on its underlying surety claim. This court reiterated that, as stated above, if judgment has entered, " 'actual damages' shall be taken to be the amount of the judgment for the purpose of bad faith multiplication." *Id.* at 81-82, quoting *Kapp* v. *Arbella Mut. Ins. Co.*, 426 Mass. at 685. The judge had awarded c. 93A damages of twice the judgment on the underlying claim, and this court affirmed the award, stating that "the judge did precisely what the language of the 1989 amendment requires." *Granger, supra* at 82.

In the present case, the judge and the Appeals Court both concluded that loss of use damages ought to form the basis of an award of multiple damages for AIGDC's postjudgment violation because such an award was in keeping with the policies behind c. 176D, § 3 (9) (*f*), and c. 93A. AIGDC argues that multiplying the tort judgment is improper because AIGDC's postjudgment failure to settle did not cause the underlying tort judgment. These conclusions and arguments misread both the 1989 amendment and our decision in *Granger*. In order to be

---

[19]The situation described in the preceding sentence of text must be differentiated from two other possible scenarios. In cases where an underlying judgment has entered, but the c. 93A violation gives rise to single damages only because the violation was not wilful or knowing, the 1989 amendment is inapplicable — it only applies to damages "to be multiplied by the court." Accordingly, the single damages would be calculated in the same manner as they were before the 1989 amendment. See *Yeagle* v. *Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. 650, 653-654 (1997). Similarly, if no judgment has entered on any claim arising out of the same and underlying transaction or occurrence (for example, if the underlying case settles), it is impossible to apply the language of the 1989 amendment to a related c. 93A violation. Therefore, the c. 93A damages are to be determined in the same way that they were before the 1989 amendment, and if the violation was wilful or knowing, those actual damages are to be multiplied. See *Kapp* v. *Arbella Mut. Ins. Co.*, 426 Mass. 683, 685-686 (1998); *Clegg* v. *Butler*, 424 Mass. 413, 424-425 (1997).

awarded c. 93A damages, the plaintiffs were required to show that AIGDC's postjudgment conduct caused injury to them. We agree with the judge and the Appeals Court that AIGDC's post-judgment conduct did cause injury; at the very least, the plaintiffs did not have the use of the monetary damages the jury had awarded them in September, 2004, until the matter finally settled on June 2, 2005.[20] But whether the deceptive conduct caused the tort *judgment* is irrelevant, for several reasons. First, nothing in the text of c. 93A, § 9, states that damages are to be calculated differently in the case of a postjudgment rather than a prejudgment failure to effectuate settlement, and it is clearly the case that if knowing or wilful prejudgment conduct causes injury, the proper measure of damages would be the underlying tort judgment. Second, c. 93A, § 9, does not require a causal relationship between the unfair practice and the underlying judgment itself; rather, the statutory causation requirement focuses on the relationship between the unfair practice and injury to the plaintiff. Moreover, there is no meaningful distinction between this case, where AIGDC failed to make a prompt settlement offer after jury verdicts entered in favor of the plaintiffs, and the *Granger* case. The damages suffered by the plaintiff-in-counterclaim in *Granger* after the verdict were loss of use of the settlement funds, just as they were here, yet this court concluded that multiple damages must be calculated based on the underlying judgment, not on the loss of use damages.[21] *Granger*, 435 Mass. at 82. Thus, we conclude that the language of the

---

[20]Additionally, a postjudgment refusal to settle promptly can cause the same injuries as a late pretrial settlement offer. The plaintiffs can continue to suffer the costs and frustrations of litigation, as well as the fear of financial ruin, during the appeal process.

[21]AIGDC emphasizes the Appeals Court's ruling that because "litigation at the appellate level had not commenced to a significant degree at [the time of settlement] . . . the statutory purpose was served by measuring punitive damages according to loss of use." We find two flaws with that reasoning, however. First, "[w]here, as here, the statutory text is clear, '[w]e are not free simply to add language to a statute for the purpose of "interpret[ing] [the statute] according to [the Legislature's] perceived objectives." ' " *Commonwealth* v. *Gillis*, 448 Mass. 354, 363 (2007), quoting *Commonwealth* v. *One 1980 Volvo Auto.*, 388 Mass. 1014, 1015-1016 (1983). Second, the court in the *Granger* case did not base its finding that the judgment must be multiplied on the length of time that the plaintiff-in-counterclaim was forced to defend the appeal. See *R.W. Granger & Sons* v. *J & S Insulation, Inc.*, 435 Mass. 66, 82 (2001).

1989 amendment requires that we award, as c. 93A damages, double the amount of the judgment entered in favor of the family on its underlying negligence claim against the GAF-insured defendants.[22]

AIGDC asserts, however, that in this case, the plaintiffs' tort judgment against the GAF-insured defendants does not arise out of the same and underlying transaction or occurrence as their c. 93A claim against AIGDC for two reasons, neither of which we find persuasive.

First, AIGDC appears to claim that a judgment can only arise "out of the same and underlying transaction or occurrence" as a c. 93A claim if the judgment is issued directly against the insurer and there is a "first party relationship" between the claimant and the insurer. While AIGDC is correct that the decisions commonly cited as providing the impetus for the 1989 amendment (*Bertassi*, *Wallace*, and *Trempe*) were all cases in which the claimant-plaintiff was suing his own insurer for unfair claims settlement practices rather than the insurer of a tortfeasor who had harmed him, the 1989 amendment makes no distinction between first-party and third-party insurers for any purpose, including calculation of multiple damages. Had the drafters of the 1989 amendment intended to allow multiple damages to be awarded on judgments only in cases where an insured sued his own insurer, presumably they would have stated it explicitly, particularly given that c. 93A had previously been interpreted to permit third-party claims against insurers for unfair claim settlement practices. See *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 674-675 (1983). We presume that the Legislature was aware of prior amendments to c. 93A and this court's interpretations of c. 93A when it enacted the 1989 amendment. *CFM Buckley/North, LLC* v. *Assessors of Greenfield*, 453 Mass. 404, 412 (2009), quoting *Condon* v. *Haitsma*, 325 Mass. 371, 373 (1950) ("Legislature must be presumed to have meant what the words plainly say, and it also must be presumed that the Legislature knew preexisting law and the decisions of this court").

Second, AIGDC contends that because the family's judgment

---

[22]The judge determined that double, rather than treble, damages should be awarded for AIGDC's wilful and knowing conduct.

on the tort claim was not obtained in the same proceeding with the c. 93A claim, that judgment does not arise out of the same and underlying transaction or occurrence and should not be the basis for an award of multiple damages.[23] See *Drywall Sys., Inc. v. ZVI Constr. Co.*, 435 Mass. 664, 668 (2002) (*Drywall*) (discussing *Clegg v. Butler*, 424 Mass. 413 [1997] [*Clegg*], and *Bonofiglio v. Commercial Union Ins. Co.*, 411 Mass. 31 [1991], *S.C.*, 412 Mass. 612 [1992] [*Bonofiglio*]). The *Clegg* case held that, because a settlement is not a judgment, the full amount of the settlement cannot be multiplied to determine multiple damages under the 1989 amendment. *Clegg, supra* at 424-425. Likewise, the *Bonofiglio* case held that an arbitrator's award, for the purposes of a *judge's* calculation of multiple damages in a court action brought under c. 93A, is not a judgment. *Bonofiglio, supra* at 37. However, in *Drywall*, we held that an arbitrator's award, for the purpose of an *arbitrator's* calculation of multiple damages under c. 93A in an arbitral proceeding, is the equivalent of a judgment, and therefore an arbitrator is not prohibited from awarding multiple damages on the full amount of an arbitration award, although a "court" would not be entitled to do so. *Drywall, supra* at 669. We conclude that the judgment against the GAF-insured defendants, which was neither a settlement nor an arbitration award, did arise out of the same transaction or occurrence as the c. 93A claim.

AIGDC further contends that multiplying the amount of the judgment in the tort action creates a "grossly excessive" award of punitive damages that violates AIGDC's right to due process under the Fourteenth Amendment to the United States Constitution. "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (*Campbell*). In AIGDC's view, in order to determine whether the award was grossly excessive, we must apply the "[t]hree guideposts" outlined by the United States Supreme Court in *Campbell* and its predecessor, *BMW of N.*

[23]To the extent that AIGDC contends the judgment was not obtained in the same proceeding because the tort action and c. 93A action were initiated by two separate complaints — as opposed to amending the original tort complaint to include a c. 93A claim — we dismiss the argument as one of form over substance.

*Am., Inc.* v. *Gore*, 517 U.S. 559, 574-585 (1996) (*Gore*); AIGDC also relies on *Exxon Shipping Co.* v. *Baker*, 554 U.S. 471, 501 (2008) (*Baker*), citing *Campbell*, *supra* at 425, and *Gore*, *supra* at 574-575 ("our cases have announced due process standards that every award must pass").

The Supreme Court's chief concern in cases like *Campbell*, *Gore*, and *Baker* was that "[j]ury instructions typically leave the jury with wide discretion in choosing amounts," which can lead to arbitrary and unconstitutional awards of punitive damages. *Campbell*, 538 U.S. at 417. It seems unlikely that in using the words "every award" in *Baker*, 554 U.S. at 501, the Court intended to expand its prior holdings to require application of the guideposts to the review of punitive damages awarded, as here, by a judge pursuant to a specific statutory formula, rather than by a jury. Under c. 93A, the award of punitive damages is significantly circumscribed. The judge may only award them if the defendant acted wilfully or knowingly, and the award must be between two and three times compensatory damages included in a judgment on any claim arising from the same and underlying transaction or occurrence. G. L. c. 93A, § 9 (3).

Nonetheless, there is no need to decide whether the *Campbell-Gore* guideposts govern multiple awards of damages under c. 93A because if we were to assume that the guideposts do apply, this award would pass constitutional muster. First, AIGDC's conduct was sufficiently reprehensible to merit the award of punitive damages. See *Campbell*, 538 U.S. at 419. The target of the conduct, the Rhodes family, was financially vulnerable because they had used much of their savings to pay for Marcia's medical expenses.[24] Of significance as well, the conduct involved repeated actions over several years; AIGDC failed to effectuate prompt settlement both before and after the judgment. Finally, the violation resulted from conduct that was both wilful and knowing.

Second, the ratio between compensatory and punitive damages is not excessive. The punitive award is two times the amount

---

[24]When AIGDC filed notices of appeal after the jury verdicts, Harold testified that he "realized that if they can delay this for two more years, we would be in dire financial straits. And I was just absolutely afraid that we wouldn't be able to withstand two more years and then we would just have to take whatever they offered."

of the underlying negligence judgment, which was a compensatory award for the combination of Marcia's injuries, including pain and suffering, and Harold's and Rebecca's loss of consortium. AIGDC argues that calculating damages based on the negligence judgment is inappropriate because there is "no relationship whatsoever with the actual compensatory damages caused by the unfair or deceptive trade practice." We disagree; the unfair settlement practice is intimately bound up with the underlying negligence judgment. In a case like this one, where a plaintiff suffers catastrophic injuries, the failure to effectuate a prompt settlement is particularly harmful to the claimant because high unpaid medical expenses make the prompt receipt of insurance funds extremely important. Insurers also have a greater incentive to delay settlement as long as possible, hoping to force the claimant to accept a lower offer. The statute puts insurers on notice that if they wilfully fail to effectuate settlement on a case with high potential for a large judgment at trial, they are liable for up to treble damages based on that judgment amount. If AIGDC had not acted wilfully and unreasonably in refusing to settle the case, it could have avoided the imposition of any punitive damages on the judgment amount.

The third guidepost is "the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' " *Campbell*, 538 U.S. at 428, quoting *Gore*, 517 U.S. at 575. A $1,000 civil penalty may be imposed for violating G. L. c. 176D, see G. L. c. 176D, § 7, and a $5,000 civil penalty may be imposed for violating c. 93A, see G. L. c. 93A, § 4. But because c. 93A was intended to be enforced by private parties, see *Ameripride Linen & Apparel Servs., Inc.* v. *Eat Well, Inc.*, 65 Mass. App. Ct. 63, 69-70 (2005), and only rarely are civil penalties sought by the Attorney General, this disparity is not enough, on its own, to find that the award of punitive damages is excessive. We conclude that the award of punitive damages is not so "grossly excessive" as to violate AIGDC's due process protections.

As a final issue, the plaintiffs assert that under c. 93A, not only are they entitled to receive punitive damages calculated as a multiple of the negligence judgment, but they are also entitled to compensatory damages for loss of use of funds and the frustra-

tions of litigation, including emotional distress. This is incorrect. The statute provides in pertinent part: "[R]ecovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; *or* up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of [G. L. c. 93A, § 2]" (emphasis added). G. L. c. 93A, § 9 (3). A prevailing plaintiff does not receive both actual damages and multiple damages — it is one or the other. See *Granger,* 435 Mass. at 80-82 (affirming award of double damages and no compensatory damages). Because the judge found that AIGDC's conduct was wilful and knowing, the plaintiffs are entitled to an award of multiple damages only.

c. *Zurich's conduct.* The judge found that Zurich did not violate its duty under § 3 (9) (*f*) to effectuate a prompt, fair, and equitable settlement with the plaintiffs once liability and damages had become reasonably clear. He found that Zurich's determination of liability and damages was not completed until November 19, 2003, and that "Zurich acted with the promptness required under [§ 3 (9) (*f*)] when it provided AIGDC with its verbal tender of policy limits on January 23, 2004." As of January 23, AIGDC had taken over the obligation to effectuate a prompt, fair, and equitable settlement offer with the plaintiffs.

The plaintiffs challenge the judge's finding, arguing that Zurich improperly delayed its investigation of the family's claim in violation of Zurich's own best practices policy, and that liability and damages, at least up to the policy limits, would have been reasonably clear by late 2002, had Zurich taken the proper steps to investigate. Thus, the plaintiffs state, it should not have taken Zurich until March of 2004 to tender verbally its policy limits to AIGDC.

Our review of the record indicates that the trial judge's findings on the issues when liability and damages were reasonably clear, and whether Zurich tendered its policy limits promptly, were not clearly erroneous; there is no basis to disturb them. The record also supports the judge's determination that Zurich, the primary insurer, satisfied its duty to effectuate settlement by tendering the policy limits to AIGDC, where it was clear that the case would not settle for an amount within the primary policy

limits, necessitating the involvement of the excess insurer. We affirm the judgment in Zurich's favor.

3. *Conclusion.* We recognize that $22 million in c. 93A damages is an enormous sum, but the language and history of the 1989 amendment to c. 93A leave no option but to calculate the award of double damages against AIGDC based on the amount of the underlying tort judgment. The Legislature may wish to consider expanding the range of permissible punitive damages to be awarded for knowing or wilful violations of the statute to include more than single, but less than double, damages; or developing a special measure of punitive damages to be applied in unfair claim settlement practice cases brought under c. 176D, § 3 (9), and c. 93A that is different from the measure used in other types of c. 93A actions. We remand this case to the Superior Court for a redetermination of damages in accordance with this opinion.

*So ordered.*