# United States Court of Appeals
## For the First Circuit

Nos. 19-1496
     19-1609

CAPITOL SPECIALTY INSURANCE CORPORATION,

Plaintiff, Appellee/Cross-Appellant,

v.

KAILEE M. HIGGINS, individually and as assignee of PJD
Entertainment of Worcester, Inc., d/b/a Centerfolds II,

Defendant, Appellant/Cross-Appellee,

PJD ENTERTAINMENT OF WORCESTER, INC., d/b/a CENTERFOLDS II,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter,[*] Associate Justice,
and Lipez, Circuit Judge.

Joan A. Lukey, with whom Justin J. Wolosz, Choate Hall &
Stewart LLP, Peter A. Palmer, John P. Donohue, and Fuller,
Rosenberg, Palmer & Beliveau LLP were on brief, for
appellant/cross-appellee.
Kevin J. O'Connor, with whom Peter C. Netburn, Michael C.
Kinton, and Hermes, Netburn, O'Connor & Spearing, P.C. were on

---

[*]    Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

brief, for appellee/cross-appellant.

March 11, 2020

**LYNCH**, **Circuit Judge**.  The origins of this case are in a November 2010 serious car accident in which Kailee Higgins was grievously injured.  She was only twenty years old, and the two-car collision was shortly after she left a nightclub called Centerfolds II while heavily intoxicated.  She worked there as an exotic dancer and there was evidence she had been served alcohol there.  Her state court lawsuit against the nightclub did not go to trial or result in a judgment after verdict.  After the club's insurer tendered the policy limit, the club and Higgins privately settled the state court lawsuit, and a consent judgment for $7.5 million was entered.  That judgment was entered without judicial evaluation or approval.  The nightclub's payment was limited to $50,000, and the nightclub assigned its claims against its insurer to Higgins.

In federal court, Higgins sued the nightclub's insurer, Capitol Specialty Insurance Corp. (Capitol) under Massachusetts General Laws c. 93A and c. 176D.  She alleged the insurer violated these laws by "[r]efusing to pay claims without conducting a reasonable investigation," Mass. Gen. Laws c. 176D, § 3(9)(d), and for "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," id. § 3(9)(f), both in violation of c. 93A.  The federal district court ruled for Higgins on these claims and assessed actual damages of $1.8 million against Capitol, which it then

- 3 -

trebled after concluding that Capitol's violations were willful. The trebled damages award was $5.4 million.

Both parties appealed. Higgins asserts that the district court erred by: (1) refusing to use the $7.5 million amount of the consent judgment between her and the nightclub, the insured, as the base for trebling her damages in the suit against Capitol; and (2) allegedly failing to rule on the claims against the insurer assigned to her by her employer as part of the settlement.

Capitol, in turn, opposes Higgins' appeal and asserts the district court erred by: (1) finding it violated c. 176D; (2) finding any violation was willful; (3) in the calculation of Higgins' actual damages for any such violation; and (4) awarding prejudgment interest on the treble damages award and not the actual damages amount of $1.8 million.

On the whole, we affirm and leave the parties where they were except that we reverse and remand for calculation of prejudgment interest based on Higgins' actual damages and not the treble damages figure.

I.

A.   Facts

In 2010, Kailee Higgins began work as an exotic dancer at a Worcester nightclub called Centerfolds II, owned by P.J.D. Entertainment of Worcester, Inc. (collectively PJD). PJD told

- 4 -

Higgins that she should encourage customers to buy drinks, and PJD commonly served alcohol to dancers that customers had purchased for them. This policy was consistent with Higgins' experience working at other clubs. Higgins was under the age of twenty-one, which PJD knew because PJD had required her to provide her driver's license when she was hired. Still, the drink servers at PJD never requested proof of her age and served her alcohol.

Alcoholic drinks at PJD came from the bar, the private "Champagne Room," and "Shot Girls" on the nightclub floor. Higgins regularly drank while performing at PJD. PJD also provided dancers, including Higgins, with a free drink at the beginning of their shifts.

PJD had a policy of a bouncer escorting dancers to their cars at the end of their shifts and if the dancers were intoxicated, calling a cab for them. PJD's bouncer, Duane Prince, was supposed to ensure the safety of dancers.

On November 27, 2010, a Saturday night, Higgins worked a 10:00 p.m.-to-2:00 a.m. shift at PJD, during which she consumed approximately fifteen shots of tequila and became heavily intoxicated. At no point did a PJD employee prevent her from consuming alcohol. Another PJD dancer stated at deposition that Higgins was unsteady on her feet and unusually loud that night. At 2:00 a.m., on November 28, 2010, Higgins' shift ended, and Prince then escorted her to her car in the parking lot. Prince

opened the car door for Higgins, physically put her into the driver's seat, and handed her the keys. At 2:30 a.m. Higgins texted a friend "he he maaadd drunk lol."

Soon after leaving PJD, Higgins was involved in a two-car collision. The other car was driven by an off-duty Worcester police officer. She suffered serious, disabling, disfiguring, and permanent injuries. The accident was at the intersection of Hamilton Street and Puritan Avenue in Worcester, which was about a five-to-seven-minute drive from PJD.

Richard McCabe, the owner of PJD, learned of the accident and spoke with the manager, bartender, waitress, and floor host who were on duty the night of the crash. McCabe said that these individuals told him that no one from PJD served Higgins alcohol, nor had anyone observed her drinking alcohol. McCabe also obtained signed statements from the bartender and waitress stating that they did not serve Higgins any alcohol. McCabe also spoke with Prince, who stated that Higgins was not intoxicated when he walked her to her car. Apparently no one from PJD spoke to the police detail officer usually at the club on Friday and Saturday nights.

On December 8, 2010, McCabe reported the accident to PJD's insurance broker, who informed Capitol, PJD's insurer, by submitting an "ACORD Notice of Occurrence" form. PJD had a

$300,000 liquor liability (LL) policy with Capitol.[1]  In an email sent with the form, PJD's broker informed Capitol that Higgins was underage, that she had suffered severe injuries, that the Massachusetts State Police (MSP) were investigating the accident, and that representatives of the Alcohol Beverage Board had "been out to the club to take statements from the employees . . . working on the night" of the accident.  Also included with the email was the signed statement of PJD's bartender stating that she was the only bartender working that night, that she was "solely responsible for pouring and dispensing alcoholic beverages," and that she did not provide any alcohol to Higgins.

A week later, on December 15, 2010, Capitol assigned the claim to Norfield Associates (Norfield) to perform a "limited investigation."  On December 28, 2010, Norfield sent Capitol a preliminary report of its investigation.  The report primarily relied on Norfield's telephone interviews of Richard McCabe and Robert McCabe, PJD's manager and Richard's brother.  Richard McCabe informed Norfield that both PJD and the Worcester Police Department (WPD) interviewed all the employees and that the employees "universally [asserted] that Ms. Higgins had not consumed any

---

[1]     PJD also had a general liability (GL) policy with a limit of $1,000,000, but that is not at issue in this case.  PJD's LL policy was an "eroding" policy, which means that after a claim is made, the cost of investigating and defending the claim is deducted from the policy limit.  But before a claim is made, Capitol bears the cost of investigation.

alcoholic beverages during the evening in question." He also stated that there is a listing at PJD of all the dancers under the age of twenty-one so that the wait staff know not to serve them alcohol.

Robert McCabe confirmed what Richard had stated about the list of underage dancers and told Norfield that Higgins arrived around 10:00 p.m. and left PJD around 2:00 a.m. that night. He further noted that the bartender was the only employee responsible for serving alcohol on the night of the accident.

Norfield also informed Capitol of the steps it outlined to take next, which included conducting in-person interviews with Robert McCabe and the bartender and seeking out copies of relevant documents, including PJD's employee list and the employee sign-in sheet from the night of the accident. Norfield also told Capitol that it had submitted a request for the WPD accident report.

About two weeks after the Norfield preliminary report, on January 11, 2011, Capitol Claims Manager Michael Wedwick noted in Capitol's claim file that Capitol had received Norfield's report and that there was "no indication of drinking on the part of the [independent] contract dancer." The file also stated that "[n]o claims are being made, [insured] denies service of alcohol to underaged Higgins," and "[t]old [Norfield] to close file." Norfield ceased investigating after Capitol closed the file and so did not take the steps it had outlined.

On February 3, 2012, about fourteen months after the accident, Attorney John Donohue sent a letter to Richard McCabe stating that he would be representing Higgins "regarding damages she has suffered as a result" of the accident. The letter stated that Higgins, only twenty years old, "was served and permitted to consume alcohol to the point where she became intoxicated" and that she was "assisted to her vehicle by the agents, servants, or employees" of PJD, causing her to be in a serious car accident. The letter informed McCabe that PJD was "liable for all the significant damages suffered by Ms. Higgins" and that "[t]his office intends to enforce that liability completely and to the fullest extent of the law." The letter requested the contact information of PJD's insurer and requested the preservation of evidence for any of Higgins' "potential claims."

Capitol received the letter from PJD on February 13, 2012. In an entry in Capitol's claim file notes, Wedwick wrote "reopened file as now [Higgins] is making claim for her injuries [through attorney] alleging that the [insured] served [her] while they knew she was underaged." Capitol nonetheless did not reopen the investigation. Rather, it responded to Attorney Donohue the same day, stating that it denied "any and all liability on the part of our insured for your client's injuries" and that PJD "denies that they served alcohol to your under aged client and they are not responsible for the injuries sustained by your client

when she was involved in a motor vehicle accident."

On February 17, 2012, Attorney Donohue wrote to Capitol requesting information about the liability limits of PJD's policy. Capitol responded on February 22, 2012, and enclosed PJD's policy limits. Wedwick again closed the file on April 10, 2012, without doing any further investigation and without having obtained the WPD report on the accident which appears to have been issued, at the latest, by mid-March 2011.

On February 22, 2013, Higgins filed a complaint against PJD in Massachusetts state court, alleging that PJD negligently caused her injuries by serving her alcohol, encouraging excessive consumption of alcohol by its dancers, failing to ask her for proof of her age, and escorting her to her car for her to drive away while she was obviously intoxicated. The complaint stated that the MSP had performed blood sample analysis and discovered that Higgins' blood alcohol level "was in excess of .150 mg/dl." The damages sought included $239,343 in medical expenses and $58,000 in lost wages. Richard McCabe was served with the complaint on May 23, 2013.[2] The insurer was not named as a party in the state tort suit.

On May 24, 2013, Wedwick reopened Capitol's file and

_____

[2] It appears that McCabe informed Capitol of the suit because Capitol acknowledged its awareness of the suit the next day in its claim file notes.

- 10 -

noted that Capitol had just retained Attorney Jeffrey Stern to defend PJD. On May 30, 2013, Attorney Stern wrote to Wedwick and summarized his review of "the police report, including witness statements, accident reconstruction report, search warrants, toxicology report and cell phone records." He stated that Higgins' "failure to yield" had been identified as the "primary cause of the accident, with her high blood alcohol content" and the speed of the other car "listed as contributing factors."

Attorney Stern's letter further stated that Higgins' blood alcohol content was twice the legal limit, witnesses said they did not see her drinking but that a police detail officer inside the club that night noted that she may have consumed alcohol in the "Champagne Lounge," and that there had been multiple servers on the floor. This information, he said, was inconsistent with the signed statement of PJD's bartender that she was the sole source of alcohol served, and of PJD's bouncer who said he escorted a not intoxicated Higgins to her car after her shift. Further, Stern stated that at about 2:30 a.m. Higgins texted a friend "he he maadd drunk lol."

On May 30, 2013, Wedwick noted in Capitol's claim file notes that the District Attorney had sent a "151 page police report." That report concluded that Higgins was at fault for the accident and that her intoxication, which was twice the legal limit, was a contributing factor to the crash. The report also

contained witness statements from Robert McCabe, Prince, the bartender, and the floor host, all of whom again stated that they had not observed Higgins drink alcohol that night.

On June 19, 2013, Attorney Stern wrote to Wedwick stating that "there is a real possibility that Patrons bought drinks for [Higgins]" and that the McCabes had admitted that PJD was aware of Higgins' age. On July 29, 2013, Stern sent Wedwick a memorandum which reported that PJD's general manager told Stern that "it is common for patrons to buy drinks for dancers" and that it was "not uncommon for dancers to have something to drink (or use weed) before they come to the club." In an email sent with the memorandum, Stern told Wedwick that "[i]t seems pretty likely that [Higgins] did some drinking at the club."

On August 23, 2013, Stern sent Capitol a "Defense Counsel Initial Analysis." That report stated that it was "likely that [Higgins] did in fact consume alcohol during the time she was working," that it was "unlikely that she consumed anything in her vehicle after leaving" given that the accident occurred fifteen to thirty minutes after she left PJD, and that Higgins asserted she had been stumbling as a PJD employee escorted her to her car.

Given the nature of Higgins' injuries, Attorney Stern told Capitol that "there is clearly seven figure potential" and the likely verdict, if Higgins prevailed, was "$500,000-$1,000,000." Stern also advised Capitol that "it is really too

soon to give a recommendation [regarding settlement], without knowing more than we do about what [Higgins] alleges in terms of who supplied her with alcohol."

On August 26, 2013, Capitol asked Stern to recommend a settlement offer, to which Stern replied that he needed to take Higgins' deposition first. A month later, on September 27, 2013, Stern again stated he was "reluctant" to make a recommendation about settlement until he took Higgins' deposition. Stern took Higgins' deposition on December 6, 2013, and concluded that she would credibly testify that PJD encouraged her to drink at work. He recommended that Capitol offer the policy limit to Higgins as settlement. Capitol agreed. On December 10, 2013, Stern emailed Richard McCabe to inform him of this recommendation and that "the exposure in this case is clearly in seven figures."

On December 19, 2013, Stern emailed Attorney Donohue offering the policy limit less the cost of defense, which amounted to $284,000. Attorney Donohue appears not to have received this offer, but acknowledged in his next correspondence on December 27, 2013, that he was aware that Capitol was willing to offer the LL limit.

On December 27, 2013, Attorney Donohue rejected the $284,000 offer and demanded $1.3 million as a price of negotiating, the full policy limit under both the GL and LL policies, and did not state that Higgins would release PJD from liability in

exchange.  On January 7, 2014, Wedwick wrote to his supervisor that he "was reluctant to put any GL money up on this.  I think if we file the DJ, [Higgins'] counsel may back-off and take the 300k to wrap this up."  Capitol did not agree to the demand from Higgins' lawyer, Donohue.

B.  Procedural History of this Litigation and the State Tort Litigation

On June 23, 2014, Capitol initiated the present federal court action against both Higgins and PJD, seeking a declaration that the maximum amount available to Higgins was $300,000 under the LL policy.  Higgins asserted counterclaims against Capitol for violations of c. 93A and c. 176D (the "direct claims").  On September 1, 2015, the district court entered summary judgment in favor of Capitol that the policy limit was the $300,000 policy.

Six weeks later, on October 16, 2015, Capitol tendered a check to Higgins for $267,170.88, the amount remaining under the eroded LL policy.  Higgins apparently accepted the payment but did not release PJD from liability.

In late 2014, while the insurer's declaratory action was pending in federal court, PJD, through its in-house counsel and not through Attorney Stern, engaged in settlement negotiations with Higgins.  On December 17, 2014, PJD's counsel in the declaratory suit wrote to Capitol and informed it that Higgins had approached PJD and "expressed an interest in entering into an

agreement for judgment with PJD which would fully protect and shield PJD from personal liability on the stipulated judgment beyond any amount PJD agrees to contribute personally to the judgment." The letter further stated that "such an agreed judgment would include a provision in which Higgins would agree not to execute against PJD on the stipulated judgment, but would instead pursue Capitol for any and all recoveries related to the stipulated judgment." Accordingly, PJD requested a written waiver from Capitol of any potential non-cooperation defense under the policy. PJD's letter did not invite Capitol to participate in any settlement discussions in Higgins' state court lawsuit. Capitol replied on January 5, 2015, and stated that it did not consent to this proposal.

The state court suit was settled without the involvement of Capitol. On July 2, 2015, Higgins and PJD entered into an "Agreement for Judgment, Agreement to Hold Harmless, [and] Covenant Not to Sue" and filed it with the Worcester Superior Court Clerk under Mass. R. Civ. P. 58(a).[3] The agreement stated that the parties agreed that judgment would enter for Higgins in the amount of $7.5 million, that PJD agreed to pay $50,000 "in

---

[3] Rule 58(a) states that "upon a written agreement for judgment for a sum certain or denying relief, the clerk, unless the court otherwise orders, shall forthwith prepare, sign and enter judgment without awaiting any direction by the court." Mass. R. Civ. P. 58(a).

- 15 -

recognition of PJD['s] potential, uninsured exposure upon this Judgment," that Higgins agreed she would not execute the balance of the judgment against PJD, and that PJD agreed to assign its rights against Capitol "relating to any and all claims . . . for violations of M.G.L. [c.] 176D, M.G.L. [c.] 93A" to Higgins. On August 7, 2015, the Clerk of the Worcester Superior Court issued an execution in the amount of $9,734,733.85, which included $2,234,436.35 in prejudgment interest. See Mass. R. Civ. P. 58(a). Capitol did not receive notice that an agreement was reached nor that it would be entered as a consent judgment without judicial review.

In March 2016, Higgins amended her counterclaims in this federal lawsuit against Capitol to include the claims assigned to her by PJD. These claims alleged violations of c. 93A and c. 176D (the "assigned claims").

After an eight-day bench trial, the federal district court, in a brief written order, ruled in favor of Higgins on her direct claims, concluding that Capitol had willfully violated c. 93A, section 9 and c. 176D, sections 3(9)(d) and 3(9)(f). As to the violation of section 3(9)(d), the district court concluded that Capitol had violated this provision by ending the Norfield investigation "[d]espite knowing virtually nothing about the events of the evening other than self-serving statements from select employees." Capitol then again failed to investigate after

receiving Attorney Donohue's February 3, 2012, letter of representation. If Capitol had "used minimal effort and expense" in investigating the claim, the district court reasoned, it would have discovered the names and addresses of the employees working the night of the accident, learned about PJD's policy of requiring dancers to encourage patrons to buy drinks for them, and discovered that there were other individuals serving alcohol that night besides the bartender.

As to the violation of section 3(9)(f), the district court determined that liability had been reasonably clear before Capitol's offering of the policy limit because PJD regularly provided Higgins alcohol despite being aware she was only twenty years old, a violation of Massachusetts law. See Mass. Gen. Laws c. 138, § 34.[4] The district court rejected Capitol's argument that liability was not reasonably clear because Higgins had been contributorily negligent.

The district court concluded that Capitol's violations caused Higgins to suffer adverse consequences, including depriving

---

[4] This provision applies to whoever makes a sale or delivery of alcohol or furnishes alcohol to a person under twenty-one years of age. Mass. Gen. Laws c. 138, § 34. "Furnishes" is defined as "knowingly or intentionally" supplying, giving, or providing, or allowing a person under twenty-one years of age to possess alcoholic beverages on premises or property owned or controlled by the person charged. Id. It states that a violation shall be punished by a fine of not more than $2,000 or by imprisonment for not more than one year or both. Id.

her of "the opportunity to engage in a timely settlement process," delaying "for years her obtaining of the [PJD] policy proceeds," "forc[ing] her to litigate her tort claims against PJD, causing her to be unable to pay her significant unpaid medical expenses for a period of years, caus[ing] her physical and mental anguish and emotional distress," and "diminishing by almost $33,000.00 the insurance coverage that was ultimately left for her after the policy limit was unnecessarily eroded by litigation costs."

As to Higgins' state court settlement with PJD for $7.5 million and the assignment of PJD's rights to Higgins, the district court rejected that this settlement "was an arm[']s length transaction and binding on the Court." Instead, the district court entered "a judgment against Capitol without regard to the [PJD] settlement" and assessed actual damages caused by Capitol's two violations in the amount of $1.8 million.

The district court then trebled the actual damages, for a total of $5.4 million, because it found as a matter of fact that Capitol's violations were willful, knowing, and in bad faith. The district court cited the facts that Capitol "twice closed its file without doing even a cursory investigation" and that once Attorney Stern became involved, liability had become reasonably clear within weeks. The district court awarded Higgins prejudgment interest on the treble damages figure and costs.

Higgins timely appealed and Capitol timely cross-

appealed to this court.

II.

"Following a bench trial on a [c.] 93A claim, we review the district court's legal conclusions de novo and its underlying factual findings for clear error." Baker v. Goldman, Sachs & Co., 771 F.3d 37, 49 (1st Cir. 2014) (quoting Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 34 (1st Cir. 2007)). The same is true for the c. 176D claims. The federal court sitting in diversity applies the substantive law of Massachusetts. See Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26, 34 (1st Cir. 2019). We first describe the applicable provisions under Massachusetts General Laws c. 176D and then turn to the parties' assertions of error.!

Chapter 176D, section 3(9) provides a list of acts and omissions by insurance companies that constitute "unfair claim settlement practices." Mass. Gen. Laws c. 176D, § 3. Two are pertinent here: "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information," id. § 3(9)(d), and "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," id. § 3(9)(f). Chapter 93A provides the cause of action for violations of c. 176D. See Mass. Gen. Laws c. 93A, § 9 ("Any person . . . whose rights are affected by another person violating the provisions of [c. 176D, § 3(9)] may bring an action"

- 19 -

under c. 93A, section 9.); see also Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1075 (Mass. 2012).

If an insurance company's unfair practice was "willful or knowing," then recovery "shall be . . . up to three but not less than two times" "the amount of actual damages." Mass. Gen. Laws c. 93A, § 9(3). Significantly, this section of c. 93A was amended in 1989 to further state that "the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence." Id. (emphasis added). One significant issue here is whether "the judgment" referred to in the 1989 amendment as construed by the Massachusetts Supreme Judicial Court (SJC) covers the consent judgment at issue here. For the reasons it articulated, the district court concluded it did not.

In a case involving a judgment rendered after jury trial and verdict, the SJC has explained that under this provision, "if a defendant commits a wilful or knowing c. 93A violation that finds its roots in an event or a transaction that has given rise to a judgment in favor of the plaintiff, then the damages for the c. 93A violation are calculated by multiplying the amount of that judgment." Rhodes, 961 N.E.2d at 1078. Rhodes was equally clear that "if no judgment has entered . . . it is impossible to apply the language of the 1989 amendment" and so "the c. 93A damages are to be determined in the same way that they were before the 1989

amendment, and if the violation was wilful or knowing, those actual damages are to be multiplied." Id. at 1078 n.19.

III.

A.   Higgins' Challenge that the Consent Judgment Must Serve as the Base for Multiple Damages Under Chapter 93A

Higgins' appeal first argues that the district court erred by using its calculation of her actual damages, rather than the $7.5 million consent judgment, as the base for trebling her damages. She reads the term "judgment" in the 1989 amendment to include consent judgments in which the insurer played no role, at least where that judgment was not collusive. She argues that the district court's statement that the consent judgment was not an "arm[']s length transaction and binding on the [c]ourt" was not a proxy for a finding that her consent judgment was sufficiently collusive not to be binding as to Capitol.

She relies on an intermediate state court decision, Gore v. Arbella Mutual Insurance Co., 932 N.E.2d 837 (Mass. App. Ct. 2010). In Gore, the plaintiff was injured in a car accident with the insured. Id. at 841. Eventually, the plaintiff and the insured settled, after which a stipulated judgment was entered against the insured pursuant to Florida law, the insured assigned his rights against his insurer to the plaintiff, and the plaintiff agreed not to execute against the insured on the stipulated judgment. Id. at 842. The plaintiff then sued the insurer for willfully violating c. 176D and sought multiple damages. Id. at

- 21 -

843.  The c. 93A court ruled for the plaintiff, but concluded that because "there was no trial and no 'decision by a court' [on the plaintiff's claim], but only a stipulated judgment entered by the court pursuant to a settlement," that agreement "did not constitute a judgment that could be multiplied under c. 93A."  Id. at 851. However, the c. 93A court also made a separate finding that the amount in the stipulated judgment was reasonable and non-collusive.  Id. at 849.

The Massachusetts Appeals Court (MAC) determined that the Gore c. 93A court had erred in rejecting the stipulated judgment as a basis for multiple damages because the cases it had relied on for support simply required that "where multiple damages are sought under G.L. c. 93A based on 'claims arising out of the same and underlying transaction,' those claims must be determined in the same proceeding with the multiple damages claims."  Id. at 851 (emphasis added).  And in Gore, the MAC explained, the plaintiff's claim, "which the [trial] judge properly determined to be reasonable and noncollusive, was determined in the same proceeding with the multiple damages claim."[5]  Id. (emphasis

_____

[5]   In a footnote, the Gore court elaborated on this statement, explaining that "in order to justify the amount of the settlement . . . [the plaintiff] was required to establish the reasonableness of the settlement amount."  Id. at 851 n.18.  The court went on to explain that the plaintiff was "[t]hus . . . required to come forward with evidence of her likelihood of success on the merits of her claim against [the insured] and the likely verdict range she should recover against him."  Id.  The Gore

- 22 -

added).  So, the MAC remanded so that the award could be multiplied.  Id. at 853.

In short, under the MAC's view, a later c. 93A court involving a c. 176D claim is free retrospectively to find an underlying stipulated judgment is reasonable and noncollusive regardless of the fact that there was neither a verdict nor a court approved sum simultaneous with that stipulated judgment.  In the MAC's view, if that c. 93A court finds the underlying judgment is reasonable and not collusive, the stipulated judgment is a "judgment" for purposes of the 1989 amendment.  This is, of course, a significant issue and one best addressed to the state legislature and/or the SJC.  It is not an issue we need to address for the reasons stated below.

Higgins argues that she has met the requirements under Gore for her consent judgment to be used as "the judgment" and trebled.  In her view, she met all the Gore factors and the federal trial judge erred in not so finding.  So, she reasons, the district court's conclusion that the consent judgment was not an "arm[']s length transaction and binding on the [c]ourt" was not a finding the consent judgment was collusive.

We disagree and understand the district court to have found that the $7.5 million agreement was sufficiently collusive

_____

plaintiff carried her burden by putting on evidence at her c. 93A trial to prove her underlying claim.  Id.

- 23 -

as to the insurer as to preclude its use as a "judgment" under the 1989 amendment. Indeed, other courts have used such language as "not at arm's length" when characterizing collusive settlements. See Cawthorn v. Auto-Owners Ins. Co., No. 18-12067, 2019 WL 5491557, at *5 (11th Cir. Oct. 25, 2019) (unpublished) (noting that a consent judgment "is akin to a private contract, one that is simply acknowledged and recorded by a court" and that such agreements cannot be sufficient to prove causation in a third-party bad faith insurance claim because "[i]nsurers would not know whether an insured party and an injured party entered into a consent judgment as adversaries, at arm's length and in good faith, or as friends, making a strategic decision to undermine the insurance company's policy"); see also Simonsen v. Barlo Plastics Co., 551 F.2d 469, 473 (1st Cir. 1977) (using the terms "collusive" and "did not act at arm's length" interchangeably); In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig., No. 11-md-02208-MAP, 2014 WL 6968424, at *6 (D. Mass. Dec. 9, 2014) (same).[6] The district court did not rest alone on the arm's length finding and explicitly rejected the agreement as "binding on the court." The language at the least supports this view because a

---

[6] As Capitol points out, the district court had been directed to the test in Gore by the parties. Further, the district court's use of this term was in the precise location where the Gore test was applicable -- where the district court determined Higgins' damages and what value should be trebled.

determination that the agreement was collusive means that the agreement was not binding as to Capitol for the calculation of treble damages.

As the SJC recognized in Commerce Insurance Company v. Szafarowicz, a case involving an insurer's duty to defend, the situation here raises the strong risk of collusion. The SJC stated that "where an insured tortfeasor defendant enters into a prejudgment settlement with an injured plaintiff in which the defendant assigns his or her rights to the plaintiff in return for a release from personal liability, there is the risk that 'collusion may exist between the injured party and the tortfeasor.'" 131 N.E.3d 782, 796 (Mass. 2019) (quoting Campione v. Wilson, 661 N.E.2d 658, 663 (Mass. 1996)). The SJC explained that "[t]his is because, as a result of such a settlement, 'the insured . . . loses the incentive to contest his liability or the extent of the injured party's damages either in negotiations or at trial.'"[7] Id. (omission in original) (quoting Campione, 661 N.E.2d at 662).

Further, there was "a substantial risk of underlitigation in the negotiation of [the] agreement." Id. at

---

[7] It is true that the SJC noted that not all such agreements are collusive "simply because the parties have negotiated a settlement where only the insurer is at risk of paying the plaintiff's damages and the defendant will be released from liability." Id. at 798. But no evidence here points to error in the determination by the trial judge.

795.  As the SJC recognized, "[s]uch a settlement [as between Higgins and PJD], if enforceable, would certainly bind the parties to the settlement; it is quite a separate issue whether it would bind the insurer where the insurer is not a party to the settlement and did not consent to it."  Id. at 796.  Thus we view the issue as being not whether the settlement agreement was enforceable as between the parties to it but as to its use against an unconsenting and nonparticipating insurer.

PJD's interest in resolving the underlying tort suit was to minimize its own exposure after its insurance policy limit had been offered.  Attorney Stern had been explicit in telling PJD that "the exposure in this case is clearly in seven figures."  So, PJD was aware that it faced considerable liability and damages exposure and had a strong incentive to protect itself.  Higgins and PJD agreed to the $7.5 million figure while also agreeing that Higgins would never attempt to collect more than $50,000 from PJD.  Higgins' incentive was to maximize the sum in the consent judgment, while PJD had no converse incentive to limit the amount because it had capped its liability at $50,000, a figure far below the estimated seven-figure liability that PJD knew it was facing.[8]

_____

[8]    At oral argument, Higgins for the first time argued that the agreement only prevented Higgins from enforcing the judgment against PJD, and that it remained a possibility that some other unidentified party might pursue a claim.  The claim settled was the one brought by Higgins.

Further, Higgins' expert testified that the motive behind the agreement "was to establish a judgment solely for the purpose of pursuing" the c. 93A case against Capitol. The $7.5 million amount of the consent judgment supports this view, as it was more than seven times greater than Attorney Stern's estimate that a likely verdict, if Higgins prevailed, was between $500,000 and $1,000,000.

Capitol did not participate in the negotiated settlement and, indeed, expressly declined to consent to a waiver of its rights and of PJD's duty to cooperate with it.[9] While it is true that PJD's attorney gave Capitol notice of PJD's desire to settle with Higgins in December 2014 by sending Capitol a letter requesting written waiver of any claim against PJD for noncooperation under the policy, Capitol responded that it did not consent to this request and stated that the case was defensible. Capitol was given no notice that a consent settlement was reached and no notice that the consent settlement was to be presented to a court or that the consent settlement would be filed without

---

[9] Further, on July 1, 2015, the day before PJD and Higgins signed the agreement, Attorney Donohue sent PJD's counsel an email in which he noted that under the Massachusetts Rules of Civil Procedure, "upon filing the Agreement for Judgment at the court, the court clerk 'shall forthwith prepare, sign and enter judgment without any direction by the court.'" (Emphasis in original.) PJD and Higgins explicitly sought to avoid judicial review of the judgment at the time of settlement, thus avoiding the risk of a contemporaneous judicial decision that did not approve the settlement.

seeking judicial review.

These facts amply support the district court's conclusion that the consent judgment should not be the sum from which the treble damages award was calculated.[10]

B.  Higgins' Challenges Related to the Trial Judge's View of Claims Assigned to Her by PJD

Higgins argues that the district court erred by failing to rule in her favor, or to rule at all, on her assigned claims. Capitol argues that regardless the assigned claims fail as a matter of law. The district court's opinion could be read to reject Higgins' argument that she is entitled to damages on the assigned claims. Moreover, given that Capitol met its duty to defend and that, as to indemnity, Capitol offered the policy limit to Higgins, we are doubtful the insurer violated a duty to PJD. In any event, there is no evidence of any monetary loss as to the assigned claims, so they fail.

PJD is an entity engaged in "trade or commerce," which means Higgins needed to pursue her assigned claims under c. 93A, section 11. Chapter 176D violations brought under section 11, unlike section 9, are not per se violations of c. 93A. See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993). Under section 11, Higgins needed to show that PJD suffered

_____

[10]  Because Higgins is not entitled to a larger damages award, we do not reach Capitol's argument that such damages would violate Capitol's due process rights.

- 28 -

"a loss of money or property . . . as a result" of Capitol's unfair act. Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1074 (Mass. 2014).

Higgins asserts that PJD has suffered such a monetary loss in four ways: (1) exposure to liability in excess of the policy limit; (2) loss of $33,000 of eroded insurance coverage; (3) loss of the $50,000 PJD paid to Higgins to obtain a covenant not to sue; and (4) PJD's personal attorney's fees and expenses incurred in defending the tort action. None of these theories work.

As to exposure to liability in excess of the policy limits, there is no evidence that Capitol ever could have settled at the policy limit and secured a release of all liability for PJD. As to the erosion of the policy to less than $300,000, Capitol expended these funds for the purpose of investigating the claim and defending its insured. If anything, Capitol should have expended more funds to investigate further. Further, there is no evidence that PJD paid Higgins any more than it would have had Capitol not expended these funds from the policy. The $50,000 paid by PJD to Higgins was also not an injury caused by Capitol; PJD's exposure was above its insurance policy limit, which had already been offered to Higgins, and so any payment PJD made in order to limit its own exposure was not an injury caused by Capitol. For the same reason, PJD's decision to use its own in-

house counsel to limit its exposure beyond the policy limit was not an injury caused by Capitol.

## IV.
## Capitol's Challenges to the District Court's Rulings on Higgins' Direct Claims

A. Whether the District Court Erred in Finding Capitol Had Violated Chapter 176D

Capitol challenges the district court's determination that it violated sections 3(9)(d) and 3(9)(f) of c. 176D. As to section 3(9)(d), we see no clear error in the district court's factual findings, nor did it commit any error of law. We need not reach the issue of whether Capitol also violated c. 176D under section 3(9)(f).

As to section 3(9)(d), we first reject Capitol's assertion that Attorney Donohue's February 3, 2012, letter was not a "claim" because it only referred to "potential claims" and did not demand a specific dollar amount. The letter clearly stated that PJD was liable for Higgins' damages and that Attorney Donohue "intend[ed] to enforce that liability completely and to the fullest extent of the law." There was no need to state a damages amount to make it a claim. Further, Capitol's own response to this letter referenced a "[c]laim [n]umber" that corresponded to the accident. This clearly constituted a claim.

The same day Capitol received the letter, February 13, 2012, it responded denying any and all liability on the part of

PJD.  At this point, the only investigation that had been performed was the curtailed Norfield investigation.  When Capitol shut down the Norfield investigation, the only pieces of evidence it possessed were the statements of PJD's owner, manager, and a single bartender, each of whom had incentives under Massachusetts tort law, criminal law, and licensing law not to be accurate as to whether they had served or knew of alcohol being served to the underage Higgins.  See Mass. Gen. Laws c. 138, §§ 34, 64.  Further, statements from only these three hardly covered the number of relevant witnesses.  Notably, the insurer did not obtain a statement from the police officer present that evening, or other employees.

Further, Norfield had informed Capitol that it still needed to obtain important documents like the employee sign-in sheet, which would have revealed more potential witnesses, including dancers.  The dancers would have informed Capitol that PJD's business model relied on dancers encouraging patrons to buy drinks.  This omission was particularly telling given that this was common in the industry as to which Capitol provided insurance.  Capitol is in the business of providing liquor liability insurance and plainly should have understood the dynamics of the industry.

The insurer had little reason from Norfield's limited reports to exclude the possibility that Higgins obtained alcohol at the nightclub the night of the accident.  Capitol should have

- 31 -

known that information from other employees about the nightclub's practices could offer important insight into the accuracy of the few statements Norfield had taken. Indeed, defense counsel discovered as much within a week of beginning his investigation. We cannot conclude that the district court erred in finding that an investigation cut off after hearing only from self-interested individuals was unreasonable.[11]

B. The Trial Judge Did Not Err in Finding Capitol's Violation of Chapter 176D Was Willful

The trial judge's finding that Capitol's section 9 violations were "willful, knowing and in bad faith" was amply supported. Here, Capitol shut down the initial investigation on January 11, 2011, after Norfield had provided the accounts of only three of the larger number of relevant individuals, each with

---

[11] Capitol's reliance on Van Dyke v. St. Paul Fire and Marine Insurance Co., 448 N.E.2d 357 (Mass. 1983), is misplaced. The SJC there determined that the plaintiffs were not entitled to recover under c. 93A, section 9 for violations of c. 176D because even "[i]f [the insurer] had conducted a proper investigation before rejecting [their] demand, . . . liability would not have been reasonably clear and [the insurer] would have been warranted in rejecting the demand." Id. at 362. But in Van Dyke, the insurer had shown through affidavits that liability would not have been reasonably clear. Id. at 361-62. Here, by contrast, by June 19, 2013, at the very latest, Capitol was aware that Higgins was highly intoxicated at the time of the accident, that Higgins was only twenty years old, that PJD served alcohol from multiple sources the night of the accident, that patrons likely purchased drinks for Higgins, and that Higgins crashed only a few minutes away from PJD, all of which tend to support liability.

incentive to dissemble, and explicitly told Capitol it intended to pursue additional lines of inquiry. Then in February 2012, Capitol again denied liability and did so without additional investigation. These actions came from an insurance company surely knowledgeable about bars and clubs subject to liquor liability laws as to which it provided LL coverage. Once Attorney Stern became involved, he was easily able to acquire the information that tended to show PJD's liability within weeks. We see no clear error as to the district court's factual findings on this point: Capitol's conduct was willful, knowing, and in bad faith.

C.   The Amount of Higgins' Damages

Capitol next argues that the district court erred in calculating Higgins' damages and that Higgins is only entitled to damages in the form of lost interest. But on appeal, it is Capitol's burden to show clear error in the district court's findings and Capitol has not met this burden.

The district court committed no error of law. "[T]o recover under c. 93A, § 9, a plaintiff must prove causation -- that is, the plaintiff is required to prove that the defendant's unfair or deceptive act caused an adverse consequence or loss." Rhodes, 961 N.E.2d at 1076. The loss must also be a foreseeable result of the violation. Auto Flat Car Crushers, 17 N.E.3d at 1080. It is true that the SJC has stated that the measure of actual damages is "typically [the] loss of the use of such funds

from the time when the claim should have been paid to the time that a settlement or judgment was paid." Rhodes, 961 N.E.2d at 1077. But the SJC has also made clear that damages, including emotional distress damages and damages from fear of financial ruin, can result from delayed payment by insurers and are recoverable as actual damages under c. 93A and c. 176D. See id. at 1078 n.20 (noting that a postjudgment refusal to settle promptly "can cause the same injuries as a late pretrial settlement offer" because "plaintiffs can continue to suffer the costs and frustrations of litigation, as well as the fear of financial ruin, during the appeal process"); Chery v. Metro. Prop. & Cas. Ins. Co., 948 N.E.2d 1278, 1280-81 (Mass. App. Ct. 2011) (concluding that plaintiff had shown for purposes of surviving summary judgment injuries from violation of c. 176D, section 3(9)(f) in the forms of being forced to litigate to receive benefits and emotional distress resulting from unpaid medical bills); cf. Haddad v. Gonzales, 576 N.E.2d 658, 871 (Mass. 1991) (concluding that damages for intentional infliction of emotional distress under c. 93A are recoverable and subject to multiple damages).

We do not describe the full extent of Higgins' injuries because her injuries from the accident itself cannot serve as the basis for her c. 93A damages. But Capitol's violation foreseeably caused Higgins other types of harm, as the district court found, during the nearly two-year period between Capitol's denial of

- 34 -

liability on February 13, 2012, and its offer of the policy limit to Higgins on December 19, 2013.

Capitol's attack focuses on the district court's factual determination. The district court listed six general reasons for the sum it chose. It stated that Higgins suffered adverse consequences as a result of Capitol's violation, including:

> depriving Ms. Higgins of the opportunity to engage in a timely settlement process, delay[ing] for a period of years her obtaining of the P.J.D. policy proceeds, needlessly forc[ing] her to litigate her tort claims against P.J.D., caus[ing] her to be unable to pay her significant unpaid medical expenses for a period of years, caus[ing] her physical and mental anguish and emotional distress, in addition to the severe physical, mental, and emotional injuries that she sustained in the motor vehicle accident, [and] by diminishing by almost $33,000.00 the insurance coverage that was ultimately left for her after the policy limits [were] unnecessarily eroded by litigation costs incurred once she made a claim.

We see no clear error in the district court's determination. Before the accident, Higgins supported herself and her younger sister solely on tips from dancing at PJD. She received no salary from PJD and, indeed, had to pay PJD for the opportunity to dance at the club. Before the accident she earned enough to have her own apartment.

After the accident, the medical costs were immediate and recurrent. The evidence is she had no insurance from her work and Capitol does not suggest she had any insurance or means of support

- 35 -

and put in no evidence to that effect. Higgins spent weeks in the hospital followed by a stay at a rehabilitation facility. She had numerous emergency surgeries to repair facial injuries. She could no longer work and so lost her sole means of support for herself and her sister. She could no longer afford her apartment and was forced to move into disability housing.

Capitol knew, or should have known, of the extent of Higgins' injuries and that she could no longer work. So, the district court did not clearly err in finding it foreseeable that Higgins, lacking both a source of income and medical insurance, would experience emotional distress and mental anguish about her inability to support herself and her sister or to pay her medical or other bills. It also was foreseeable that Higgins' living arrangements would change for the worse and that her fear of financial ruin would escalate during the nearly two-year period between the filing of her claim and her receipt of the insurance proceeds. In addition, the district court could supportably find that Higgins' need to hire an attorney to file a lawsuit imposed both financial and emotional costs.

Capitol concedes that if it violated c. 176D, Higgins suffered at least some actual damages from lost interest. Capitol has not pointed to any clear error.

Finally, the district court appropriately applied c. 93A's multiple damages provision, which states that recovery

"shall be" between two and three times the actual damages.

D.   Prejudgment Interest

Capitol argues that the district court erred "when it calculated prejudgment interest on the trebled damages award, not the single damages award."  We agree.  In McEvoy Travel Bureau, Inc. v. Norton Co., 563 N.E.2d 188 (Mass. 1990), the plaintiff argued that "it was entitled to prejudgment interest on the entire" double damages figure it had been awarded, rather than on the damages that served as the base for multiplication.  Id. at 196. The SJC rejected this argument, reasoning that "[t]o add prejudgment interest to these penal damages would compound the penalty and would violate the purpose" of the Massachusetts prejudgment interest statute.  Id.

Higgins asserts that the more recent SJC decision in Anderson v. National Union Fire Insurance Co., 67 N.E.3d 1232 (Mass. 2017), shows that the SJC permits prejudgment interest to be calculated on a multiple damages award.  In that case, the SJC compared prejudgment and postjudgment interest in order to determine if postjudgment interest was part of the "amount of the judgment" under c. 93A.  Id. at 1237.  The SJC noted that in contrast to postjudgment interest, prejudgment interest is "an integral part of the amount of the judgment itself."  Id. at 1238. But as explained above, Higgins' measure of damages is her "actual damages" because there was no "judgment" in her case.  So, Anderson

- 37 -

does not apply.

So, we reverse the district court's decision to award prejudgment interest on the treble damages figure and remand for a calculation of prejudgment interest on Higgins' actual damages.

V.

We affirm the decision of the district court in all respects except its award of prejudgment interest. As to prejudgment interest, we reverse and remand for calculation of prejudgment interest on Higgins' actual damages.